COMI *v.* STATE

[No. 128, October Term, 1952.]

474

*Decided June 11, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William C. Walsh* and *Joseph Allen,* with whom were *Henry M. Siegel* and *Joseph Rosenthal,* on the brief, for appellant.

*Kenneth C. Proctor, Assistant Attorney General,* with whom were *Edward D. E. Rollins,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City, *J. Harold Grady* and *Theodore C. Waters, Jr.,* Assistant State's Attorneys, on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment and sentence of seven years and fine of $2,000 entered upon a jury's verdict in a prosecution for conspiracy to violate the lottery laws. The sufficiency of the evidence is not challenged but it is contended that the court erred in a number of rulings in the course of the trial.

The indictment charged that during the period from January 1, 1950 through January 17, 1952, the appellant unlawfully conspired with Leo Quattroche, Anthony Astarita, Alexander Astarita, Thomas Murray, Washington Bragg, Norman Brown, and other persons unknown, to violate the lottery laws. The State produced testimony from Leo Quattroche and Alexander Astarita that they had worked for the defendant and written numbers for him. There was testimony that Anthony Astarita wrote numbers with his brother, but both denied that Anthony had any direct dealings with Comi as backer. The State also produced testimony from the respective wives of Leo Quattroche and Anthony Astarita, and the brother of Mrs. Quattroche, that Louis Comi had promised to pay the fines imposed upon the alleged co-conspirators for previous convictions of violations of the lottery laws, as well as their legal expenses, and that the wives received payments for support while their husbands were in jail.

In his opening statement to the jury the State's Attorney had described Thomas Murray as his "star witness" and emphasized the importance of his testimony. After the testimony of the Quattroches and Astaritas had been concluded, the State's Attorney, in the presence of the jury, asked the Court's indulgence because "we have been put in a position where this Thomas Murray, our star witness has disappeared. He left home yesterday morning * * *." At this point the defendant's counsel objected "to any statement being made before the jury." A conference was then held out of the hearing of the jury. It was agreed that the State might call Murray as a witness if he appeared during the course of the trial.

Officer Baker testified that Murray had been arrested and convicted on a lottery charge on October 18, 1951 and sentenced to nine months in the House of Correction and to pay a fine of $1,000. The State then produced Washington Bragg, who testified that in July 1951 he accompanied Murray on a trip to a shore near Essex. Murray told him he had to deliver a package of money to Louis Comi. However, he testified he was unable to identify Comi in the courtroom, and that he did not see Comi at the shore, and did not know where the place was, as it was dark. The court refused to strike out the testimony at that time, stating that he would "let it in subject to be followed up." The State then produced Sanford Gibson, who testified the defendant gave him a roll of bills with which to pay Murray's fine on May 10, 1952, and that the defendant drove him to the city jail to obtain Murray's release. When Murray came out and saw Comi in the car, he refused to enter it. The State also proved through court officials that Gibson paid Murray's fine.

The next morning, a news item in the Baltimore Sun, under the headline "Comi Trial 'Star Witness' Missing", stated that among the developments was "Disappearance of the State's 'star witness', a man who gave testimony against Comi before the grand jury and who later returned to jail rather than accept freedom given him when Comi paid his $1000.00 fine imposed on a lottery charge." This publication was brought to the court's attention and was the basis for a motion declaring a mistrial, which the court overruled.

The defense then produced 21 character witnesses. The first witness, J. Milton Mauer, testified that he knew the reputation of the defendant for truth and veracity in the neighborhood where he resided, and that it was good. Defense counsel then announced that the defendant had been convicted of pandering some years ago (in 1937) and asked the witness: "Knowing that, would that change your opinion?" The witness said it would not. On cross-examination, the State's Attorney after

some questions about the pandering conviction asked: "Did you know that Mr. Comi was arrested and charged with conspiracy to violate the lottery laws in October, 1943?" The witness answered: "No." Defense counsel stated: "We object to that and move that be stricken unless he has a conviction." The State's Attorney remarked: "Of course, it is not a conviction." The court remarked: "This goes to his character", and overruled the objection. The State's Attorney then inquired, without objection: "Does that fact change your evaluation of his character?" The witness answered: "No." The State's Attorney then asked: "Did you know he was charged with maintaining a lottery in January of 1942, and tried in court?" Over objection, the witness replied: "No, that wouldn't change my mind, the only thing I knew about that is what little I read in the paper." The State's Attorney also put a similar question as to a lottery charge on November 18, 1940. These same questions were put to other witnesses, in cross-examination. Defense counsel then proceeded, in calling succeeding character witnesses, to ask them concerning these lottery charges. A typical instance was in the case of Frank Tagliaferri, where defense counsel stated: "I think he was arrested a couple of times, two or three times, for lottery, and dismissed, about eight or ten years ago; would that change your opinion of his reputation for truth and veracity?" The witness replied: "Not as I know the gentleman."

The appellant then took the stand. He testified he had never been in the lottery business. He denied the accusations of the State's witnesses, which he ascribed to attempted blackmail following the conviction of his brother, Johnny Comi, on lottery and conspiracy charges in the State and federal courts. His testimony was corroborated to some extent by the testimony of three witnesses. He admitted he had been convicted of pandering and other prior offenses. He testified he had not been convicted of any crime since 1937.

At the conclusion of the defendant's case the court granted a motion to strike out Bragg's testimony, on

the ground that no link had been shown between Murray and the defendant as to the shore incident in 1951. Over objection, the court limited the time for argument to the jury to one hour and fifteen minutes a side. In the midst of the defense argument, Thomas Murray appeared in court. The argument was suspended, and conference was held with the court. Defense counsel insisted that the State call him as its witness; the State declined. Defense counsel then obtained permission to question Murray in the presence of the State's Attorney. After questioning, they called him as a defense witness. Murray testified he had never received a summons to appear and had been at home on the two days before the trial began. He further testified that he had never seen the defendant, and had never worked for him. Over objection, the State was permitted to cross-examine Murray at length. After reference had been made to his testimony before the grand jury, he admitted that he had worked for Louis Comi, and that Bragg had accompanied him to a shore in 1951, where he had delivered certain money to Louis Comi. Murray was also questioned as to his connection with Johnny Comi. Argument to the jury was then resumed, but the time for argument was not extended beyond the time originally allotted.

The chief point argued on this appeal is the contention that the court erred in permitting the cross-examination of character witnesses as to their knowledge of prior lottery charges against the accused. It has long been recognized in Maryland that an accused may introduce testimony of his general reputation for good character, although such testimony must be limited to "what is generally said of him by those among whom he resides". *Berger v. State,* 179 Md. 410, 414, 20 A. 2d 146, 148. It is almost universally recognized that the State may then offer rebuttal testimony as to a reputation to the contrary, or may cross-examine to show public report of acts inconsistent with the trait of character which the witness has asserted to be publicly attributed to the

accused. "The settled rule against impeachment by extrinsic testimony of particular acts of misconduct is to be distinguished in its application from a kind of questioning which rests upon the principle that the witness' grounds of knowledge may always be inquired into:". III *Wigmore on Evidence,* (3d Ed.) Sec. 988. When the defendant's character, in the sense of reputation as distinguished from disposition, is thus put in issue, particular acts of misconduct which might affect his general reputation may be referred to as a test of the witness' credibility and the grounds of his belief. *Stewart v. United States,* 70 App. D. C. 101, 104 F. 2d 234, 235. In this connection, the cases indicate that no distinction is to be drawn between convictions and charges which result in acquittal, but the line is sharply drawn between "the general talk of people about defendant, rather than the witness' own knowledge of him, the form of inquiry, 'Have you heard?' has general approval, and 'Do you know?' is not allowed." *Michelson v. United States,* 335 U. S. 469, 482, 69 S. Ct. 213, 221, 93 L. Ed. 168. *Cf. Saunders v. United States,* 89 U. S. App. D. C. 291, 192 F. 2d 409, 411, and *United States v. Conforti,* 7 Cir., 200 F. 2d 365, 369. See also *Wharton, Criminal Evidence,* (11th Ed.) Sec. 1299, and *Underhill, Criminal Evidence,* (1935 Ed.) Sec. 172.

In the instant case we think the questions propounded were objectionable in form. However, it may be noted that at the outset defense counsel framed the inquiries improperly, and when the State's Attorney adopted the same type of question, there was no objection on this ground. The objection was specifically directed towards the fact that the arrests referred to had not resulted in convictions, which under the authorities is untenable. Moreover, defense counsel then proceeded to elicit from other character witnesses, in direct examination, the same information, stating as a fact that the arrests had been made and asking for the personal opinions of the witnesses based on the facts alleged. Under the circumstances we think the error, if any, in the court's

rulings was waived or cured. See *United States v. Gruber*, 2 Cir., 123 F. 2d 307. *Cf. Colie v. State*, 193 Md. 608, 611, 69 A. 2d 497, and cases cited.

The appellant contends that the court erred in refusing to limit the State's cross-examination of Murray to matters testified to in direct examination. If the defense had limited its examination to questions explaining his failure to appear, there would be force in the contention. However, when Murray was interrogated and testified that he had never seen Comi and never worked for him, we think it was proper to permit cross-examination in regard to his previous admissions and particularly in regard to his trip to the shore with Bragg. *Cf. Williams v. Graff*, 194 Md. 516, 522, 71 A. 2d 450, 23 A. L. R. 2d 106. Although Bragg's testimony had been stricken out, for failure to prove the connection, Murray's testimony supplied the missing link. Nor was Murray's testimony as to his association with Johnny Comi beyond the proper scope of the inquiry, in view of the testimony produced by the defense to the effect that Johnny and not Louis had been the real backer.

The appellant also contends that the publication of the news story about the missing witness was prejudicial. Here again, the subsequent appearance of the witness and his interrogation as to the reasons for his nonappearance cured any possible error. The article was only a factual account of what had been stated in open court, although the reporter seems to have misunderstood the testimony as to Murray's refusal to enter Comi's car. The statement that Murray had testified before the grand jury was implicit in the State's reference to him as a "star witness", and in any event the fact was admitted when Murray took the stand.

The appellant earnestly contends that the limitation upon the time allowed for argument was so unreasonable as to amount to a denial of due process. The matter is one that rests in the sound discretion of the trial court. *Cf. Shedlock v. Marshall*, 186 Md. 218, 225, 46 A. 2d 349. We find no abuse of discretion. Although

the need for expedition can never justify a denial of a reasonable opportunity to present the defendant's case, we may note the modern trend towards limitation of argument on appeal, under the rules of this court and of the Supreme Court, to one hour a side. The appellant points to the size of the transcript, containing the testimony of 38 witnesses in a three-day trial. However, 21 of these were character witnesses, and the testimony boils down to that of the co-conspirators, detailing a limited number of contacts with the alleged backer which the defendant denied, and defense testimony tending to show a motive for their alleged false testimony. The legal issues were clarified in a relatively brief charge by the court, to which there was no objection. We cannot say that the time allowed was inadequate under the circumstances.

*Judgment affirmed, with costs.*