August Robert MEYER, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Julius MATHIS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

July 2, 1971.

Rehearings Denied Dec. 3, 1971.

Frank E. Haddad, Jr., Louisville, for appellant Meyer.

David Kaplan, Stuart Lyon, Hubert Hevey, Jr., Louisville, for appellant Mathis.

John B. Breckinridge, Atty. Gen., George F. Rabe, Asst. Atty. Gen., Frankfort, for appellee.

EDWARD P. HILL, Jr., Judge.

The appellants, August Robert Meyer and Julius Mathis, on their separate but consolidated appeals seek to reverse their convictions for the wilful murder of Ralph Ronald Wright. Appellant Meyer was given the death penalty, while appellant Mathis received a life sentence.

We first discuss Meyer's appeal. He presents ten questions in his table of contents and authorities. We shall identify them as we go along.

First Meyer says his conviction cannot stand because the trial court committed prejudicial error by excluding prospective jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

Here is what occurred. The trial judge asked the panel of jurors the following question: "Do any of you sincerely hold any scruples against inflicting the death penalty? If so, raise your hand."

Whereupon a number of hands were raised. The judge then said: "Give your name and your number to the clerk, and then you may go." Fifty-nine of the original panel were thus summarily excused.

With the exclusion of so many of the prospective jurors just mentioned, it was determined by the trial judge that additional jurors were needed, and they were obtained from the courtrooms of two other judges of the Jefferson Circuit Court. However, before any of the additional jurors were dispatched from those courtrooms, those who were "opposed" to capital punishment and who "did not believe in capital punishment" were excused. Counsel for appellant Meyer objected to this manner of exclusion, but his objection was overruled.

Meyer contends that under the rule announced by the Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 776 (1968), his conviction cannot stand. The appellee, the Commonwealth of Kentucky, through its legally constituted representative, the Attorney General, has frankly conceded error in this respect and admits the conviction cannot stand, but disagrees with the appellant on the proper procedure in the trial court on remand.

Meyer urges this court to reverse and remand this case and to hold that the appellant Meyer's conviction be upheld and the sentence of death be held invalid with directions to "resentence the appellant Meyer to life imprisonment." The appellee argues that on remand another jury, properly selected, be authorized under the evidence to fix his punishment.

We turn to Witherspoon and other Federal court cases for guidance in this situation.

The Supreme Court said in Witherspoon, supra, at page 523, footnote 21, 88 S.Ct. at page 1777:

"* * * Nor does the decision in this case affect the validity of any sentence

other than one of death. Nor, finally, does today's holding render invalid the conviction, as opposed to the sentence, in this case or any other case."

In a similar case, Alexander v. State, 225 Ga. 358, 168 S.E.2d 315 (1965), the Supreme Court of Georgia in an opinion interpreting Witherspoon had this to say at page 317:

" * * * [T]he death sentence in this case must be reversed with directions that the trial court impanel a jury selected as in a capital case for the submission to it of the question of the punishment to be imposed upon the defendant for the crime of murder."

We interpret In re Hill, 71 Cal.2d 997, 80 Cal.Rptr. 537, 458 P.2d 449, 465 (1969), as announcing a similar interpretation of Witherspoon wherein it reversed "for a new penalty trial."

The United States Court of Appeals, Fifth Circuit, in Williams v. Dutton, 400 F.2d 797 (1968), announced it interpreted Witherspoon as did Georgia and California.

We find nothing in the Constitution of Kentucky to inhibit this court from interpreting *Witherspoon* as did the Georgia and California courts and the Fifth Federal Circuit Court. Neither do we think that the fact the jury was composed of only persons who believe in the death penalty rendered it incapable or prejudiced to determine the guilt or innocence of a person charged with a capital offense. Therefore, we conclude that on remand a jury be selected as in capital cases, not in violation of the *system condemned in* Witherspoon, and instructed to find appellant Meyer guilty of wilful murder and to fix his penalty at life or death within the discretion of the jury. Of course, the Commonwealth may waive its right to demand the death penalty. The defendant may not waive jury trial where he enters a plea of not guilty. See McPerkin v. Commonwealth, 236 Ky. 528, 33 S.W.2d 622, and Tackett v. Commonwealth, Ky., 320 S.W.2d 299 (1959). However, where he enters a plea of guilty, he may consent to the fixing of his punishment by the court and waive the assessment of punishment by a jury. (Not so in death cases RCr 9.84(2).)

In Fryrear v. Commonwealth, Ky., 471 S.W.2d 321, this day decided, we are giving the same interpretation of Witherspoon as herein given.

Meyer's second.argument is that the admission of his confession violated his constitutional rights. He relies upon Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Before getting into this question, we shall undertake to give some of the facts of this case along with the circumstances surrounding the giving of the confession.

Appellants Meyer and Mathis are accused in the shooting death of Ralph Ronald Wright. Wright was last seen on the evening of November 1, 1966, as he and a friend were leaving the Plantation Swim Club where Wright served as club manager and swimming coach.

The Jefferson County Police were alerted when Wright's family reported him missing. An investigation was commenced to determine the whereabouts of Wright. When the police interviewed the friend who had left the club with Wright, they learned the two men had walked together to the club parking lot and had separated at that point to go toward their respective cars. The only other information the friend was able to furnish was the description of a car he remembered seeing in the parking lot that night. The police were then able to ascertain the car's description matched that of a car owned by the appellant Meyer, who happened to be a member of the swim club. The police then interviewed Meyer and were told by him that he had talked to Wright in the parking lot but that that was the last time he had seen him, and he assumed Wright had left about the same time since he had observed

Wright's headlights behind him as he was leaving the parking area.

On November 6, 1966, Wright's body was found beside a rural road in neighboring Shelby County. An autopsy revealed the cause of death could be attributed to the presence of two gunshot wounds in the chest.

The discovery of Wright's body prompted the Jefferson County homicide detectives to enter the investigation. On November 7, 1966, Detective Barber was assigned to the case, and having been informed that Meyer was the last-known person to see Wright alive, he went to the paint store where Meyer was employed to interview him. However, due to a number of customers being present, Detective Barber suggested they go down to police headquarters where they could talk. Meyer stated he would "be glad to come downtown." The two men then went to Barber's office where they talked for an hour or more. Barber testified he talked to Meyer as a fellow law enforcement officer since Meyer told him about being a deputy marshal in the sixth-class city of Plantation. During the course of the interview, Meyer stated he had been in the parking lot the night Wright disappeared since he was on duty and was keeping a certain car under surveillance whose occupants were suspected in recent acts of vandalism in the area.

The Jefferson County and Louisville Police Departments continued their investigation into Wright's death. During the trial of the appellants, the testimony of the detectives assigned to the investigation indicated the police had at least six or seven specific suspects. On the morning of November 12, 1966, Meyer called Detective Barber and informed him of an anonymous phone call he received threatening to tell the police that Meyer had been seen by them talking to Wright in the parking lot and demanding that Meyer pay $150. Barber then asked if he would care to come to police headquarters and discuss the matter. Meyer replied he would and showed up at Detective Barber's office at approximately 9:30 a. m. While Barber and Meyer were discussing the contents of the phone call, Meyer's employer called and informed the detectives Meyer kept a small caliber pistol in his car. Meyer was then advised of the information, and he admitted he carried a .22 caliber pistol in the glove compartment of his car.

The detectives then asked Meyer for permission to search his car. Earlier Meyer had mentioned that Wright had sat in his car during their conversation at the parking lot as it was raining at the time. Therefore, the detectives wished to search Meyer's car to look for the pistol in the glove compartment and because Wright had been in Meyer's car immediately prior to his disappearance. Meyer was advised of his constitutional right to refuse the search in the absence of a search warrant. Nevertheless, Meyer signed a waiver permitting the detectives to conduct the search.

A routine search of Meyer's automobile was made in the parking lot of the county police headquarters. A short time later, a more detailed search was conducted at the Jefferson County garage. No positive clues were found in either of the searches with the exception of some spots or stains that were found on the right side of the front seat. Meyer was asked what the spots were, and he explained he had spilled a cup of coffee on the seat.

The search of Meyer's automobile was completed at approximately 4 p. m., at which time Sgt. Mitchell requested Meyer to take a lie detector test in Frankfort. After some discussion he agreed. Arrangements were made with the Kentucky State Police in Frankfort to give the lie detector test that same evening. Meyer was asked to drive his own car to Frankfort with two of the detectives riding with him. Two other detectives drove a county car.

Sgt. Mahoney of the Kentucky State Police was assigned to conduct the lie detec-

tor test. After obtaining from Meyer his name, address, age, and occupation, but prior to the actual start of the test itself, Sgt. Mahoney read the following to Meyer:

"You have a right to remain silent. Do you understand this? Anything you tell me will be used against you in a court of law. Do you understand this? You have a right to an attorney, present or appointed, or to voluntarily agree to waive these rights and to take this polygraph examination."

Meyer then refused to take the test, explaining he didn't wish to waive any of his rights before talking to an attorney.

There is a conflict in the record as to whether or not Meyer was afforded an opportunity to contact an attorney after he refused to take the lie detector test. The detective testified Meyer was offered the use of a direct state telephone line to Louisville, but he declined their offer stating he preferred to wait until his return to Louisville. Meyer contends he was never offered the use of the direct line, nor was he allowed to make a call on a private line.

As Meyer and the detectives were leaving Frankfort, the detectives asked Meyer if he would mind stopping at the Kentucky State Police Post on the outskirts of Frankfort. Meyer freely consented. The purpose of the stop was to allow the state chemist in the crime laboratory to test the stains on the car seat and a stain on a bank deposit slip found in the glove compartment. After completing his tests, the technician informed Detective Barber he had found traces of blood. Detective Barber then entered the room where Meyer and Sgt. Mitchell were talking and informed them of the results of the tests. Sgt. Mitchell described what occurred thusly:

"As the technician went into the laboratory, I walked in the laboratory myself and looked around in the laboratory. It was my first experience there. August

Meyer had come in and I walked around to the various rooms with him. And then, August Meyer and I were by ourselves in this one particular room. And I asked him if he cared to sit down and he sat down.

"And momentarily later, Sgt. Barber came into that room and said, 'That's blood in the car.' And August Meyer says, 'Well, I might as well admit it,' he says, 'I killed Ralph Wright. I shot him twice with my .22 [later clarified to 25] Colt automatic, while he was in my car.' But, he said, 'You all were wrong to think it was one man.' He said, 'There was another man with me, J. R. Mathis.' "

Meyer was immediately placed under arrest and advised of his constitutional rights. At approximately 10:15 p. m., the group left Frankfort on their return trip to Louisville. During the drive back to Louisville, Meyer freely and voluntarily told Detectives Barber and Pace the details of Wright's death and how he had taken the weapon apart and had thrown the parts away at different locations. Meyer directed the detectives to these locations and directed them where to look for the parts. Next he took the detectives to the paint store where he worked and showed the detectives where he had hidden a box of .25-caliber shells.

Finally, between 11:30 p. m. and midnight, Meyer returned to police headquarters where the detectives sought to reduce the oral statements of Meyer to writing. Meyer was allowed to call his wife, and he asked her to call Frank Haddad, Jr., and to retain him as his attorney. A short time later, Haddad called the detectives and told them he had been employed by Meyer and requested that no statement be taken from Meyer. Haddad also spoke to Meyer and advised him to make no statement.

As a result of Meyer's oral statement, the police immediately began a search for Julius R. Mathis. On November 14, 1966, Mathis surrendered to police in Birming-

ham, Alabama. He was taken before a magistrate and advised of his rights to remain silent. He refused to give any statement. He waived extradition to Kentucky and was released into the custody of the Jefferson County police officers. On the way back to Kentucky, near Decatur, Alabama, Mathis announced to the officers that there was something he would like to talk about. When asked whether it was concerning the Wright case, he said it was. The officers again advised him of his constitutional rights under *Miranda*, and they reminded him that the Alabama judge had admonished him not to talk about the case on the trip to Louisville. Mathis stated that he had talked to a Catholic priest, had gone to confession, and had received forgiveness; that he had talked to his wife and wanted to "get it off" his chest. He then confessed.

■ The Fifth Amendment to the Constitution of the United States guarantees, among other things, that no person "shall be compelled to be a witness against himself." The word "compelled" contemplates the use of "sweating" or other means of coercing a citizen to incriminate himself. Nowhere in any constitution, either Federal or state, is a requirement that officers charged with the investigation of a crime must enlighten the suspect of his right against self-incrimination. But *Miranda* does just that, and until it is overruled we must try to live with it. So let us see what *Miranda* says, 384 U.S. at page 444, 86 S. Ct. at page 1612:

"* * * [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

Meyer had not at the time of his confession, or at the time he consented to the searching of his automobile, been "taken into custody or otherwise deprived of his freedom of action in any significant way." In fact, Meyer pretending he was sympathetic and cooperative with the officers, having been one himself, did freely and voluntarily cooperate with them in practically every instance until he was wired to the polygraph lie detector in Frankfort, Kentucky. His change of mind and declination to take the test was promptly and without "whine or whimper" respected by the officers. He then reverted to his bold, audacious pretense of cooperation by consenting to have a test of the spots on the seat of his automobile. When he was advised of the results of this test, he promptly voluntarily and knowingly "spilled the beans" and confessed to his heinous crime.

■ We find no violation of *Miranda* here. He not only knew of his constitutional right against self-incrimination, but the operator of the polygraph read the *Miranda* "procedural safeguards" to him before his confession. His confession was admissible. See Jewell v. Commonwealth, Ky., 424 S.W.2d 394 (1968); Hamilton v. Commonwealth, Ky., 401 S.W.2d 80 (1966) cert. denied 385 U.S. 1014, 87 S.Ct. 728, 17 L.Ed.2d 551; and Chancellor v. Commonwealth, Ky., 438 S.W.2d 783 (1969).

The denial of separate trial says appellant Meyer was prejudicial to him by reason of the admission of Mathis' confession. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is cited.

Some of the "ground has been cut from under" Bruton by Harrington v. California, 395 U.S. 250, 252, 89 S.Ct. 1726, 1729, 23 L.Ed. 284 (1969), where the court found the evidence apart from that of codefendants was so overwhelming it was "harmless error" beyond a reasonable doubt to refer to confessions of codefendants.

In the instant case, as we have hereinbefore found, Meyer voluntarily and know-

ingly confessed the crime. Parts of the murder weapon were found at two separate spots to which Meyer led the officers. He also escorted the officers to the paint store where he worked and pointed out a box of cartridges from which he admitted he took the killing ammunition. Human blood was found in his automobile. His automobile, or one like it, was parked in the area of the swim club when deceased left work the night he was first missed by his family. Pictures were taken of appellant pointing out the box of cartridges. A small gun was observed in the desk a few days prior to the killing. He had test-fired the gun in a back room of the store in which he worked.

All this direct evidence (not circumstantial) made available by the acts of appellant points so unerringly to his guilt that we think beyond a reasonable doubt that there was no prejudice to Meyer from the admission of Mathis' confession. It follows that the trial court did not err in refusing to order separate trials. Braden v. Commonwealth, Ky., 407 S.W.2d 124 (1966), and United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296, 297 (1968).

Meyer's fourth point is that the reference in the testimony to his decision not to take a lie detector test was prejudicial. True, we said in Penn v. Commonwealth, Ky., 417 S.W.2d 258, that "an offer to take such a test [or refusal] has no evidentiary significance whatever." This reference to Meyer's refusal to take a lie detector test was improper. However, the evidence of guilt was so overwhelming and conclusive from the logic and voluntariness of his confession, including his disclosure of the place where he disposed of the murder weapon (parts of the same at different locations) and the finding of the weapon promptly after Meyer led the officers to the place, that reference to his refusal to take a lie detector test was harmless.

Meyer next cites six instances of what he terms improper and prejudicial argument by the attorney prosecuting the case.

First, he claims that a reference in the Commonwealth's closing argument to the lie detector test was improper. As we have just indicated, this was improper argument but was not prejudicial.

Secondly, he complains of the argument referring to his failure to testify in his own defense. There was no specific reference in the argument to his failure to testify. The argument was that certain evidence was not contradicted by "any witness." There was no concentrated effort to persist in this argument. Taken alone, we find nothing prejudicial here.

His third complaint of the argument relates to the argument to the jury that "Thou shalt not kill." Counsel for Meyer, arguing previous to the closing argument for the Commonwealth, placed great emphasis on cruelty and immorality of the death penalty allowed under our law. The reference to one of the Ten Commandments was neither improper nor prejudicial. It was fair argument in rebuttal to Meyer's argument.

Objection is made to the following argument of the Commonwealth: "It's now up to you. This heavy burden is going off of my shoulders. I haven't slept for the last three nights. It's yours now. What are you going to tell the decent people of this community? In all that's right and fair and just, go to your jury room and, by your verdict, tell the people of this community that what we have heard the last three days will not be tolerated, will not be permitted in this community. I plead with you, do your duty and do it promptly. It is not pleasant, but do it. And may God, in His infinite wisdom, be with you in your deliberations. Thank you." The tenor of this argument is that the jury may have to "tell the decent people of the community" of its verdict. Also that the jury should "tell the people of this community" that crimes like the one in question "will not be tolerated, will not be permitted in this community." We do not condone this argument, but it falls short of tending to cajole

or to coerce the jury, found to be reversible error in Jackson v. Commonwealth, 301 Ky. 562, 192 S.W.2d 480, and Stasel v. Commonwealth, Ky., 278 S.W.2d 727.

■ Meyer cites other instances in the closing argument of the Commonwealth's attorney, such as: (1) a reference to the mental capacity of Meyer, with the statement that had there been anything wrong with the "mind of the defendant" the court would have given such an instruction, and (2) a reference to the fact that the Commonwealth was ordered by the court to "open his file" to defendant Meyer, while the defendant Meyer was not required to do likewise, further characterizing the procedure as a "one-way street." Here again are unnecessary and "below the belt" arguments, but we are unable to conclude that they were prejudicial. Were it not for the high intelligence and fair mindedness of modern-day juries, we might reach a different conclusion. Society is indeed fortunate in having juries that are able to separate fair from unfair practice and to disregard those unfair arguments that some of our over-zealous prosecutors continue and persist in making.

Meyer's sixth ground for reversal assails his written consent to the search of his automobile. His written waiver begins with this statement:

"I, August Robert Meyer, having been informed of my constitutional rights, not to have a search made of the premises [car] hereinafter mentioned without a search warrant, and of my right to refuse to consent to such a search, hereby authorize Jefferson County police officers * * * to conduct a complete search of my 1959 Cadillac and/or automobile * * *."

■ He freely, knowingly, and voluntarily consented to the search. Furthermore, there was no incriminating evidence produced by this search. The "real McCoy" was found by the search of the spots in the car while at the state police laboratory in Frankfort, and there is no denial by Meyer that he was given every *Miranda* warning at Frankfort. We find no merit in this argument.

■ Meyer next says he was prejudiced by the introduction of photographs of the deceased taken when lying face down in the woods and other photographs showing the bullet holes in his body. We have examined those photographs and fail to detect anything "gruesome" or "inflamatory" in any of them.

Appellant Meyer's eighth argument is a recapitulation of previous arguments relative to evidence of his "cooperation" with the police. We feel we have answered this argument previously.

Error is claimed by the failure of the trial court to instruct the jury on the voluntariness of Meyer's confession. We have set out in detail the events leading up to Myer's confession. He does not deny any of this. The voluntariness of his confession was not in issue. Therefore, Bradley v. Commonwealth, Ky., 439 S.W.2d 61 (1969), has no application.

Finally, and that word is a pleasure to write, Meyer says the trial court committed prejudicial error in overruling his pre-trial motion for change of venue, also that the publicity during the trial created an atmosphere in which it was impossible for him to receive a fair trial.

■ In addition to the filing of copies of newspapers containing articles about the case, four attorneys made affidavits in support of the motion for change of venue. They did not purport to know the state of public opinion and sentiment of the community. They were largely "conclusory." The showing for change of venue was not so strong and conclusive as to require granting change. See Stone v. Commonwealth, Ky., 418 S.W.2d 646 (1967), cert. denied 390 U.S. 1010, 88 S.Ct. 1259, 20 L. Ed.2d 161.

Three witnesses stated they "were acquainted with the public opinion" and Mey-

er could receive a fair trial. Furthermore, the newspaper articles contained no criticism or vilification of him or of any other person connected with the case. We find no abuse of discretion here. Tarrance v. Commonwealth, Ky., 265 S.W.2d 40 (1954), cert. denied 348 U.S. 899, 75 S.Ct. 220, 99 L.Ed. 706. Neither do we find any prejudicial reporting of the trial during the course of same or thereafter. See Wolfe v. Commonwealth, Ky., 431 S.W.2d 859 (1968).

## MATHIS' APPEAL

Next we consider questions raised by Mathis' appeal. He raised the following five questions: (1) He questions the admission of Meyer's confession into evidence; (2) he claims he was erroneously denied a separate trial; (3) "the practice of trying defendants together when they have made statements implicating themselves and their co-defendants denies the accused of the right of fair play as advocated by Giles v. Maryland," 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); (4) here again, he questions his confession on the ground he had no attorney present; and (5) his final question is that his own confession was coerced, that it was produced by his "in custody" interrogation and without counsel.

■ We find Meyer's confession was inadmissible against Mathis, but it was not prejudicial to Mathis for the simple reason that Mathis' confession was identical to that of Meyer, except in an unimportant detail, if at all, and that was that in Meyer's confession he said Mathis struck deceased in the head with a "timing chain" four or five times after he was shot, while Mathis said that after he heard two shots fired into the body of the deceased man, he, Mathis, "blacked out." Additionally, the trial court admonished the jury not to consider Meyer's confession against Mathis.

Mathis cites Bruton v. United States, supra, in support of his contention that Meyer's statement was prejudicial to him to the extent that he should have been given a separate trial. The appellee counters with the argument that the facts in the present case take it out of the Bruton rule, and we agree. United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296 (1968). The court said in Mancusi:

"Where the jury has heard not only a codefendant's confession but the defendant's own confession no such devastating risk attends the lack of confrontation as was thought to be involved in Bruton."

See also Braden v. Commonwealth, Ky., 407 S.W.2d 124 (1966).

The answer to Mathis' first argument provides a complete answer to his second question as to separate trials.

Mathis' third point is a distillation of his argument for a separate trial. This point is answered in our discussion of his first argument.

■ Mathis' fourth point concerns the validity of his confession. He says he was interrogated by the officers after his arrest in Alabama; that he had no attorney; that when he confessed, he was under a "coercive atmosphere of an incommunicade custody situation" (sic). The evidence is clear however that the Alabama judge not only gave Mathis every Miranda warning, but cautioned Mathis not to discuss the case on the way to Louisville. The three officers who returned to Kentucky with Mathis gave a convincing account of the voluntariness of his confession. Of course he had no counsel present. But the fact that one suspected of a crime has no attorney present should not prevent him from confessing his crime if he does so voluntarily, knowing that his confession may be used against him. The important question is did the officers continue to question him after his arrest and after he was warned and advised of his constitutional rights? The three officers say not. The trial court agreed, as did the jury. We do not disagree.

The last argument presented by Mathis is that his own confession was improperly admitted in violation of the rule in Miranda v. Arizona, supra.

From what we have said both in the statement of facts and in our discussion of Mathis' confession elsewhere in this opinion, we have no difficulty in concluding that his confession was voluntary and entirely proper under *Miranda*. See also Chancellor v. Commonwealth, supra.

It should be noted that it has been deemed by the court necessary to discuss all questions raised by the two appellants as they appeal from the entire judgment. The case of Fryrear v. Commonwealth, Ky., 471 S.W.2d 321 (decided July 2, 1971), is unlike the instant case in that in *Fryrear* the appeal was only from that part of the judgment sentencing him to a death penalty.

The judgment as to Meyer is reversed for a new trial on the question of the penalty only. The judgment as to Mathis is affirmed.

All concur.