# TIMOTHY CLYDE POOLE *v.* STATE OF MARYLAND

[Nos. 9 and 11, September Term, 1982.]

*Decided January 7, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Gary S. Offutt, Assistant Public Defender,* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Deborah K. Handel, Assistant Attorney General,* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and RODOWSKY, JJ., concur and dissent as to portions of Part 1 of the opinion. COLE and DAVIDSON, JJ., concur as to portion of Part 1 and concur as to Part 8 and dissent as to Part 2 b of the opinion. MURPHY, C. J., filed a concurring and dissenting opinion at page 197 *infra,* in which SMITH and RODOWSKY, JJ., join. DAVIDSON, J., filed a concurring and dissenting opinion at page 201 *infra,* in which COLE, J., joins.

Subsequent to our reversal of the conviction of Timothy Clyde Poole [1] of premeditated murder (of David C. MacLarty), felony murder (of Steven Scott Horad), robbery with a dangerous weapon and use of a handgun in a crime of violence, for which the death penalty was imposed by a jury in the Circuit Court for Calvert County, he was retried, on our remand, by a jury in the Circuit Court for Charles County. Again, the appellant was convicted for the same offenses and, again, the death penalty was imposed. Upon our legislatively mandated automatic review,[2] we shall reverse the appellant's conviction of felony murder of Steven Horad and use of a handgun in a crime of violence. In addition, we shall affirm the remaining convictions, but vacate the sentence of death for MacLarty's murder and remand for a new sentencing proceeding consistent with the provisions of Maryland Code (1957, 1982 Repl. Vol.), Article 27, § 413.

The parties have agreed upon a statement of facts, which for purposes of this opinion, we summarize as follows:

> David Creel, a student, testified that he was working at MacLarty's Pharmacy on the evening of October 22, 1979, at approximately eight o'clock, when two black men entered the store. One put a mask over his head as he approached the backroom where Dr. David MacLarty was preparing prescriptions. The second man (identified by Creel as the appellant), not wearing a mask, approached the counter where Creel was working, pointed a shotgun at him and told him to lock the front door. Two shots were fired in the backroom and Dr. MacLarty said, "Is anyone else out there?" Creel was ordered by the gunman to say no and forced to the backroom. There they found the masked man (Steven Horad) lying on the floor and Dr. MacLarty standing by the safe with a gun in his hand in a "military" stance. Creel's assailant then shot

---

1. Poole v. State, 290 Md. 114, 428 A.2d 434 (1981) (Poole I).
2. Md. Code (1957, 1982 Repl. Vol.), Art. 27, § 414.

MacLarty with the shotgun and ordered Creel to get the money. The assailant picked up a gun lying beside MacLarty, held it to MacLarty's head, and pulled the trigger twice without result. He then took about $150 from Creel and left the premises. Both MacLarty and Horad later died.

During his testimony, Creel twice identified the appellant as the second participant in the robbery and the person who shot MacLarty. Creel's testimony also showed that he had made a photographic identification of the appellant the day after the incident and, subsequently, positively identified the appellant in a line-up.

When informed of the shooting incident the next day, Poole showed "no reaction whatsoever," and said he had not seen Horad since the afternoon of October 22nd. At the time of the shooting, the appellant was signed out of his residence at "Dismas House" on a six-hour pass for 3-H Neptune Court. He stated he had been at that address with his girlfriend, Jennifer Lanier, and her roommate, Tamara White. However, Tamara White testified that Poole had not been at 3-H Neptune Court the evening of October 22nd.

The appellant presented four types of evidence at the trial: evidence to weaken the State's case, alibi evidence, character evidence, and the appellant's testimony. This evidence included the testimony of Officer R. L. Tucker regarding the initial statement he took from Creel, describing both burglars as wearing masks. Yvonne Bethea testified that the appellant had been at her house on the evening of October 22nd, helping her with her studies. Her testimony was corroborated by the appellant. The appellant testified that once he realized Lanier would not be home, he went to Bethea's. He had not originally reported this for fear of being penalized for violating the rules at Dismas House. Major

Thomas V. Campbell, Department of Corrections, and Shirley Morrell-Carlton, Morgan State University, testified regarding their opinions of Poole's good character.

The jury found Poole guilty of the premeditated and felony murder of MacLarty, the felony murder of Horad, armed robbery, and use of a handgun in the commission of a crime of violence.

The appellant has raised a multitude of issues, both as to the guilt or innocence stage of the trial as well as to the sentencing proceeding. We shall discuss these issues as necessary to explain the conclusion we reach in this case.

1.

As indicated above, the appellant was convicted, *inter alia,* of felony murder involving his co-felon, Horad, and the use of a handgun in a crime of violence. In our prior decision in this case, we left open the question of whether the appellant could be found guilty of felony murder of Horad, who was actually killed by the victim here, MacLarty. The appellant argues that on the basis of our holding in *Campbell v. State,* 293 Md. 438, 444 A.2d 1034 (1982), these convictions may not stand. The State agrees, as do we. What the effect of this conclusion is, however, has created a controversy between the parties. Relying on *Sherman v. State,* 288 Md. 636, 421 A.2d 80 (1980), Poole argues that his conviction for the murder of MacLarty must also be reversed. We disagree with this contention. The appellant's reliance on *Sherman* is misplaced as this case is distinguishable on its facts. In *Sherman,* the jury was allowed to have an entire indictment during their deliberations despite the fact that the trial judge had granted the defendant's motions for judgment of acquittal as to two counts. We agreed with Sherman that this constituted a violation of Maryland Rule 758 a which provided that "[u]pon retiring for deliberation, the jury may . . . take into the jury room all . . . charging documents which reflect only the charges upon which the jury is to delib-

erate. . . ." [3] 288 Md. at 638-39, 421 A.2d at 81. Because we could not be sure beyond a reasonable doubt that the "dead" counts were not taken into consideration or influenced the jury's ultimate finding of guilt, we concluded that the error could not be deemed "harmless" and reversal was mandated. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

In the instant case, which was decided prior to *Campbell,* although the jury was allowed to take the indictment into the jury room during deliberation, there were no "dead" counts in the indictment. Poole had not been acquitted on any of the counts. The indictment against him charged him with, *inter alia,* the murder of Horad and use of a handgun in the commission of a felony. Accordingly, these counts were properly submitted to the jury.

In *Campbell,* this Court, for the first time, held:

"[O]rdinarily, under the felony-murder doctrine, criminal culpability shall continue to be imposed for all lethal acts committed by a felon or an accomplice acting in furtherance of a common design. However, criminal culpability ordinarily shall not be imposed for lethal acts of nonfelons that are not committed in furtherance of a common design." 293 Md. at 451-52, 444 A.2d at 1042. (Footnote omitted).

We must now determine the impact of our ruling in *Campbell* on the case at bar. Clearly, Poole's conviction for the murder of Horad cannot stand. Notwithstanding reversal of that conviction, we find that submission of that count to the jury does not require a new trial with respect to the appellant's conviction for the MacLarty murder. The responsibility of the jury was to consider each count and make a determination as to guilt or innocence thereon without consideration of any other count. It is well established that "[e]ach count in an indictment is regarded as if it

---

**3.** Although Md. Rule 758 a was amended in 1981, we note that it was not substantively changed. It now consists of three sentences rather than one.

were a separate indictment." *State v. Moulden,* 292 Md. 666, 681, 441 A.2d 699, 707 (1982), citing numerous cases. *See also Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358-59 (1932); *Ford v. State,* 274 Md. 546, 552, 337 A.2d 81, 85 (1975); *Ledbetter v. State,* 224 Md. 271, 274, 167 A.2d 596, 598 (1961); *Williams v. State,* 204 Md. 55, 64, 102 A.2d 714, 718 (1954). Under the circumstances here present, there was no reason for the jury to consider its conclusion on other counts when deliberating on the count charging the appellant with MacLarty's murder. As a matter of fact, the jury likely considered that count first as it was count one in the indictment and appeared first on the verdict sheet. Most importantly, it is obvious that the appellant's conviction for the murder of MacLarty rested on the credibility of Creel. If the jury believed Creel's testimony, they had to find Poole guilty. The submission of count two (Horad's murder), as well as the submission of the count regarding "use of a handgun in crime of violence murder" (count four on the verdict sheet and counts eight and nine in the indictment), did not add to or subtract from Creel's credibility.

Furthermore, the trial judge properly instructed the jury in pertinent part:

"Now the Defendant is charged in the indictment that is pending against him with committing four different crimes. You will have to consider each of these crimes and you will have to consider them separately because they are separate and distinct crimes."

We believe the court's instructions were clear and we assume that the jury followed them. *See, e.g., Moulden, supra,* 292 Md. at 678, 441 A.2d at 705, and cases cited therein at note 8. *See also Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476, 484 (1968). Accordingly, the appellant is not entitled to a new trial to determine guilt or innocence.

However, we do agree with the appellant's contention that reversal of the conviction of felony murder of Horad requires that the death sentence imposed for his conviction of premeditated murder of MacLarty be vacated. Notwithstanding the fact that the jury was properly instructed that it was to determine whether the death sentence should be imposed only in regard to the first degree premeditated murder of MacLarty, we cannot ignore the fact that on the preceding day this same jury had convicted the appellant of the felony murder of Horad. Our review of the record indicates that, during the sentencing proceeding, numerous references were made to the guilt or innocence stage of the trial. Initially, the prosecutor indicated to the trial judge, in the presence of the jury, that the aggravating circumstance relied upon by the State was "that the Defendant committed the murder, committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree, the aggravating circumstances, of course, robbery." The prosecutor then stated in pertinent part:

> "To support that circumstance, *the State would adopt the testimony and exhibits and the finding of the jury in the trial in chief* as establishing the existence of that aggravating circumstance." (Emphasis supplied).

Prior to the testimony of the appellant's character witnesses, the trial judge informed the jury:

> "Ladies and gentlemen, let me explain to you that The Court takes judicial notice, that takes notice of the proceedings that occur within The Court, as the finders of fact in this case, can take notice of the facts and/or findings in *the criminal case that was tried, that you just brought back a verdict on.*
>
> So in considering the aggravating circumstances *you may take notice of what the conviction was and the facts in that case."* (Emphasis supplied).

In his instructions to the jury, subsequent to the testimony, the trial judge referred to the earlier proceeding:

"Then you would go over to aggravating circumstances number 10. Okay. Now you must determine, based on the evidence that has been presented, in connection with this matter, *based on your knowledge of the case,* whether or not you are convinced unanimously beyond a reasonable doubt that aggravating circumstances number 10 exist.

Now the definition of reasonable doubt as used in this stage of the proceeding, is the same as that used in the *first stage of the proceeding,* that is the one in which you determine guilt or innocence and that is that it must be proven to you beyond a reasonable doubt and to a moral certainty, that in this case the Defendant committed the murder while committing or attempting to commit robbery, arson, or rape, or sexual offense in the first degree.

Now with respect to the robbery as used in that definition, The Court would advise you that armed robbery is in fact a greater degree of robbery, *you will recall my instructions from yesterday,* in which I instructed you that in order to find someone guilty of armed robbery you would have to find that the Defendant committed the crime, that the Defendant committed a robbery, and that he used a dangerous and deadly weapon." (Emphasis added).

In addition, the prosecutor argued in relevant part:

"The State had the burden of establishing aggravating circumstance, and the aggravating circumstance that the State is relying on, number 10, was *your verdict yesterday,* in finding Mr. Poole guilty of armed robbery, which The Court has indicated is a higher degree of robbery and that the murder occurred during the commission of the armed robbery.

You have *already returned your verdict* on the aggravating circumstances and has been proven beyond a reasonable doubt that the murder occurred during the commission of a robbery and that is what the State is relying on as the aggravating circumstance, which then requires you to move on in your search for determination as to whether any mitigating circumstances exist." (Emphasis added).

\* \* \*

"Mr. Kimble, I am mentioning now he did not testify in the sentencing phase, *he testified during the trial,* as a character witness. And I think his testimony, of course, should be considered by you *at this time* as part of his sentencing." (Emphasis added).

\* \* \*

"When you remember the testimony of the *last few days,* and compare it to the testimony today, you have got to wonder, can it be the same person?" (Emphasis added).

\* \* \*

"Is it a split personality? Or is it something like I suggested *yesterday,* . . . ." (Emphasis added).

\* \* \*

"The only other evidence, of course, the evidence adduced at the trial, other than what you heard today, that I don't think much needs to be said about. You know what he did. There is nothing mitigating whatsoever in his actions on the night of October 22, 1979, . . . ."

Finally, the defense attorney commented on what occurred during the guilt or innocence stage:

"Think back for a moment to what [the trial judge] told you *before you deliberated in this case, . . . .*" (Emphasis added).

\* \* \*

"*Yesterday* the standard of proof that you evaluated the case upon, the standard of proof that you decided resulted and must result in your mind in Mr. Poole being found guilty, that standard of proof was beyond a reasonable doubt, beyond a reasonable doubt." (Emphasis added).

"And now he stands convicted, *from your decision yesterday,* for the murder of Doctor MacLarty, *for the felony of Mr. Horad,* of armed robbery, use of a hand gun, commission of a felony." (Emphasis supplied).

We believe the jury's knowledge of the liability of Poole for Horad's death may have been prejudicial to the appellant. Because the appellant's conviction for felony murder of Horad was improper, and because we cannot be sure that consideration of the now vacated conviction did not influence the jury in weighing the mitigating circumstances against the aggravating circumstance and in reaching their determination to impose the death penalty, we cannot say the error was harmless beyond a reasonable doubt. *See Dorsey, supra.* Accordingly, the death sentence imposed is vacated and we shall remand for further proceedings consistent with this opinion.

## 2.

The appellant also contends that prosecutorial misconduct requires reversal. In support of this contention, it is claimed that throughout the trial the prosecutor engaged in a "pattern of improper conduct that had the potential of improperly influencing the jury." The appellant identifies four special areas of misconduct on the prosecutor's part:

a. by improperly appealing to the jurors' fears and passions,

b. by improperly arguing that the appellant's alibi witness would have protested his innocence immediately upon discovering he had been accused and volunteered to take a lie detector test were she telling the truth,

c. by improperly commenting upon the appellant's failure to tell his version of what he did on the day in question, and

d. by improperly arguing that the appellant's counsel had conceded the appellant's guilt.

The appellant further argues that the pattern of misconduct ran through the cross-examination of certain witnesses for the defense. We shall address these complaints as they were presented.

Prefatorily, we observe that in large measure the conduct of a trial is left to the sound discretion of the trial judge, the exercise of which will not be disturbed on appeal absent an abuse thereof. *See Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707, 714-15 (1974).

a.

It is argued that by questioning several of the appellant's witnesses to show they knew him only under limited circumstances and had never met him on the street at night, the prosecutor was playing on the fears and passions of the jury. This is so, it is contended, because we can judicially notice a general public fear of violent crime, which is more prevalent at night. We find no merit to this argument. In the context in which this type of question was asked, we conclude such questioning was relevant. All of the involved witnesses clearly were expressing their favorable experiences with and opinions of the appellant from a limited setting not at all similar to the setting surrounding the commission of the instant crime. They all knew appellant only

from their contact, in the daytime, with him at school, at different children training schools where he assisted the staffs, and at the half-way house in which he lived. In our view, it was appropriate to allow the prosecutor to attack the weight of the testimony of these witnesses in the manner in which he did. It is elementary "that an accused may introduce testimony of his general reputation for good character, . . ." and "that the State may then offer rebuttal testimony as to a reputation to the contrary, or may cross-examine to show public report of acts inconsistent with the trait of character which the witness has asserted to be publicly attributed to the accused." *Comi v. State,* 202 Md. 472, 478-79, 97 A.2d 129, 131-32 (1953). Certainly it would tend to detract from the testimony of these witnesses to bring out their limited exposure to the appellant. Once such limited exposure was established through cross-examination, it was up to the jury to weigh the testimony of the appellant's character witnesses. In our view, the cross-examination of defense witnesses Campbell and Morrell-Carlton is distinguishable from the prosecutor's remarks in *Clarke v. United States,* 256 A.2d 782 (D.C. App. 1969), relied upon by the appellant. In *Clarke,* the prosecutor made the following argument:

> "Now, take a look at the circumstances under which they were carrying theirs. *Imagine yourself in those circumstances.* In the middle of a street, a busy street, at a quarter of four on a Thursday afternoon; with a lot of people about; these two men have these two weapons. Imagine yourself waiting for one of those two or three buses — *it could be you — it could be you —* waiting right next to these men and they have these two weapons.

> * * *

> They are charged with carrying dangerous and deadly weapons. Are these dangerous and deadly weapons that these people should be allowed to

walk around in the middle of a street, busy street, at a quarter of four on a Thursday afternoon, *when you are coming off a bus— when you are coming out of a store — when you are walking down a street?* Do you want people in the District of Columbia to walk around with these, under those circumstances?" *Id.,* at 786-87 (emphasis in original).

We also note that while the court did not condone such behavior, stating that "[i]t was wrong for the prosecutor to play on the personal fears of the jury as he did," reversal of Clarke's conviction was not deemed necessary. *Id.,* at 787.

b.

It is next contended that the trial judge erred when he denied the appellant's motion for a mistrial made during the course of the prosecutor's closing argument in the guilt or innocence stage when he commented on the failure of the appellant's alibi witness (Yvonne Bethea Mitchell) to volunteer to take a lie detector test and the appellant's failure to make a statement. The trial judge concluded:

"I will deny the motion for a mistrial. I don't think the remarks were intended, nor did they give the impression that Mrs. Bethea, now known as Mrs. Mitchell, was offered and refused a lie detector test.

That the second comment, that if she had wanted to she could have gone to the police with her alibi prior to coming to court and testifying, and as to the Defendant, as to the Defendant never testifying or made a statement to a police officer, I think the jury would interpret the State's remarks that well, today is the first time we are hearing about this alibi he has offered in this trial, the first time we hear about it.

I don't think that that has been any prejudice to the Defendant in this case and will deny the motion."

What the appellant argues is simply that the trial judge erred in not granting his motion for a mistrial. We think the appellant sought too much. Initially, and as noted above, the issue was one left to the sound discretion of the trial court. In *Wilhelm, supra,* 272 Md. at 429, 326 A.2d at 723, we said:

"A request for a mistrial in a criminal case is addressed to the sound discretion of the trial court and the exercise of its discretion, in a case involving a question of prejudice which might infringe upon the right of the defendant to a fair trial, is reviewable on appeal to determine whether or not there has been an abuse of that discretion by the trial court in denying the mistrial. The decision by the trial court in the exercise of its discretion denying a mistrial will not be reversed on appeal unless it is clear that there has been prejudice to the defendant." (Citation omitted).

Within the context that "lie detector" was used, it is plain to us that the appellant was not denied a fair trial on this basis. The reference to Mitchell's failure to volunteer to take a lie detector test was not stated as an isolated item standing starkly by itself; rather, it appeared along with several other actions the witness could have taken. In addition, as noted by the trial judge in denying the motion for mistrial, "the remarks ... did [not] give the impression that ... Mitchell [had been] offered [but] refused [to take] a lie detector test." Finally, we note that the appellant sought the most drastic remedy available rather than, for example, an admonition to the jury to disregard the statement. *Cf. Lusby v. State,* 217 Md. 191, 141 A.2d 893 (1958). Accordingly, we find no reversible error here.

c.

Next the appellant argues that the court erred in denying his motion for a mistrial because the prosecutor had improperly referred to a prior proceeding and improperly

commented on his failure to tell his version of events prior to testifying in the instant case. Relying on *State v. Raithel,* 285 Md. 478, 484, 404 A.2d 264, 267 (1979), he contends that the prosecutor's statement was a comment on his "post-arrest" silence and was as improper as if direct evidence of such silence had been introduced at trial.

The State argues that "[t]here was simply no comment by the prosecutor on [appellant's] right to post-arrest silence." We agree with the State's position. It is clear to us that the prosecutor was attacking the appellant's trial testimony as, in effect, being manufactured after having heard the State's evidence, not that he had not come forward after his arrest and told his version, which he was not obligated to do. Moreover, it is patent that the State was not commenting on the appellant's failure to testify at an earlier trial. We agree with the trial court that the jury's interpretation would be "today is the first time we are hearing about this alibi he has offered in this trial. . . ." We think the matter could have easily been cleared up by a simple explanation to the jury, which we are confident the trial judge would have done had he been so requested. The trial judge did not abuse his discretion by denying the appellant's motion for a mistrial on this basis.

### d.

Finally, the appellant complains that the prosecutor improperly argues that the appellant's counsel had conceded guilt. During the State's rebuttal argument, the prosecutor stated:

> "One other, very, very interesting remark that Mr. McCarthy said that I can't let, cannot avoid calling to your attention. And I never have heard it quite said before. He says my client is guilty or not guilty rather of this crime. He did not commit this crime, but if you believe he did commit this crime, conceding that — Conceding his guilt, not — But assuming you do find him guilty —"

Building on the concept that a prosecutor is guilty of misconduct when he argues that defense counsel does not believe in his client's innocence or the validity of his defense, the appellant urges us to reverse; we decline to do so. The appellant's objection to the State's remark was sustained and the jury was instructed "that the Defense [was] not conceding the Defendant's guilt." In addition, the prosecutor corrected himself and explained that he meant "conceding that [the jury] might find Mr. Poole guilty of the charges in this case. . . ." We are persuaded that "[t]he prosecutor's unfortunate use of the term 'conceding' was more than adequately remedied by [the prosecutor's] later comments," and the instruction by the trial judge. We conclude that "it [does not] appear that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the [appellant] by the remarks of the [prosecutor]," and, accordingly, "reversal of the conviction on this ground [is] not justified." *Wilhelm, supra*, 272 Md. at 415-16, 326 A.2d at 716.

In sum, we find no merit to the appellant's multi-faceted attack presented in this issue. The appellant was not prejudiced by the prosecutor's remarks and, therefore, was not entitled to a mistrial. We conclude that the trial judge properly denied the appellant's requests for a mistrial.

3.

The appellant's next contention concerns claimed error in the trial judge's instructions with respect to reasonable doubt. Because no exception was made to this portion of the instructions at the trial, the issue is not preserved for our review. Md. Rule 885. Rule 757 h does provide, however, that we "may take cognizance of and correct any plain error in the instructions, material to the rights of the defendant even though the error was not objected to as provided by [Rule 757 f]."

The thrust of the appellant's argument is that through two examples of reasonable doubt given by the trial judge, the

State was relieved of its reasonable doubt burden and the jury could convict, finding him guilty by a preponderance of the evidence. We do not agree. The appellant seems to argue that the concept of the "without hesitation" requirement, as explicated in *Lansdowne v. State,* 287 Md. 232, 241, 412 A.2d 88, 92-93 (1980), and *Montgomery v. State,* 292 Md. 84, 95, 437 A.2d 654, 659 (1981), was left out of the instructions here. However, from our review of the record, it is clear that the factor of hesitation was given by the trial judge.[4] Moreover, as the State has aptly pointed out, this Court has recently held that there is not just one "satisfactory explanation of reasonable doubt and we decline to prescribe an instruction that will apply in every case." *Id.,* at 95, 437 A.2d at 659-60. It is well settled that "when objection is raised to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *State v. Foster,* 263 Md. 388, 397, 283 A.2d 411, 415 (1971), *cert. denied,* 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972). In our view, when read as a whole, the instruction adequately explained reasonable doubt; thus, there is no plain error for us to invoke Rule 757 h.

4.

At the beginning of the trial, before the prospective jurors were examined on voir dire, the appellant sought leave to have individual examination *in camera.* This request was denied and error is alleged. Error is also claimed because voir dire in capital cases requires jurors to be "death qualified" resulting in a jury more inclined to convict and sentence to death than would be the case if, as in non-capital cases, the voir dire examination did not involve "death qualification." [5]

---

4. In defining reasonable doubt, the court stated in pertinent part, "It is such a doubt that would cause a reasonable person to *hesitate* to act in the graver or more important transactions of life." (Emphasis supplied).

5. "Death qualification" apparently means a jury that contains no members who would automatically vote against the death penalty, or who would

With respect to the individual voir dire issue, we are not persuaded by the appellant's argument on the facts of this case. While conceding that the scope of questioning during voir dire in non-capital cases is within the discretion of the trial judge, the appellant contends that open court examination of the prospective jurors in a body does not adequately protect jury impartiality. Appellant relies upon the California case of *Hovey, supra,* n. 5, for support of his position. However, it is well established that the manner of conducting voir dire examination lies within the sound discretion of the trial court and, other than Md. Rule 752, is not governed by any statute or specific rules. *See, e.g., Langley v. State,* 281 Md. 337, 341, 378 A.2d 1338, 1340 (1977), and cases cited therein. From our reading of the record, we are not persuaded that the procedure used by the trial judge was likely to produce a jury which was prone to convict and thereafter impose the death penalty. Although the trial judge denied the appellant's request for "individual voir dire in camera," the record clearly shows that individual voir dire was conducted at the bench, in the presence of the appellant, where prospective jurors indicated they had "religious or conscientious scruples against the death penalty [ ] . . . [which would] cause [them] to automatically vote against the imposition of the death penalty. . . ." We believe that "[t]he voir dire examination in this case was extensive and probing, [and] more than adequate to uncover the existence of cause for disqualification." *Couser v. State,* 282 Md. 125, 141, 383 A.2d 389, 398 (1978), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978). Accordingly, we conclude that the trial judge did not abuse his discretion by the manner in which he conducted the voir dire.

The second prong of the appellant's argument on this issue is that the trial court restricted the voir dire to examination

be unable to fairly or impartially determine guilt due to their scruples about capital punishment. *See* Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *reh'g denied,* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968); Hovey v. Super. Ct. of Alameda City, 28 Cal.3d 1, 168 Cal. Rptr. 128, 616 P.2d 1301 (1980).

for the purpose of exercising challenges for cause. We initially observe that the appellant calls no specific instance of restriction to our attention where he wanted questions asked which were denied. Furthermore, no objection was made, so far as our reading of the record discloses. We have studied the record and find that nearly all of appellant's voir dire requests were asked, and those few which were not asked, in our view, were not relevant to the issue of empaneling a "death qualified" jury. Moreover, as we observed in *Couser, supra:*

> "It is true, of course, that the due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to an accused in a criminal case; these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that he can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case. The constitutional right to an impartial jury is basically protected by questioning on voir dire examination aimed at exposing the existence of cause for disqualification and the law of this State accordingly so limits the scope of the information which may be obtained as a matter of right; it does not encompass asking questions designed to elicit information in aid of deciding on peremptory challenges." 282 Md. at 138-39, 383 A.2d at 396-97 (numerous citations omitted).

We conclude that there was no error committed by the trial judge in the manner in which he conducted the voir dire and that the appellant was not denied his right to be tried before a fair and impartial jury.

## 5.

### (a)

During the appellant's cross-examination of State's witness Creel, the trial judge sustained an objection to a question asked of Creel during a series of questions regarding his making a photographic identification of the accused. The following occurred:

"Q. [By Mr. McCarthy] Now, after you saw the photographs on October 23rd, did the police tell you at that point that yes, that was the man?

A. [By Mr. Creel] No.

\* \* \*

Q. *Have the police or the State's Attorney ever told you that you had picked out the right guy?*

A. *No.*

Q. Now, I don't mean on the date of the 23rd, I mean anytime since then?

MR. ANDERS: Objection, Your Honor as being irrelevant.

THE COURT: Sustained."

It is claimed by the appellant that he was "attempt[ing] to determine whether Appellant's in-court identification [by Creel] was influenced by information that he had identified the right person at the line-up ... rather than from his recollection of the robbery," and that he was thereby improperly restricted in his cross-examination. We have reviewed the record in this area and find no merit to the contention. It seems perfectly clear that Creel already had answered that *at no time* did the police or the State's Attorney *ever* tell him that he had picked out the right person. Consequently, the objected-to question was cumulative at best. It is basic that "[t]he allowance or disallowance of certain questions on cross-examination normally is left to the sound discretion of the trial judge," and will not be reversed

except for abuse of that discretion. *Beasley v. State,* 271 Md. 521, 527, 318 A.2d 501, 504 (1974).

(b)

Next, the appellant claims error when the trial court overruled his objection to certain questions asked of Officer Tucker on cross-examination. Tucker had been called as a defense witness to show that there was a discrepancy between State's witness Creel's trial testimony and what he told Tucker with respect to the description of the appellant. In an effort to explain this discrepancy, the State asked questions designed to show that because of the extreme circumstances Tucker found when he went into the room where the two victims were, and particularly the condition of Dr. MacLarty, he was upset and could have made an error in noting on his report that Creel told him both Horad and the appellant were wearing stocking masks. It is argued that this line of questioning was not relevant and, in any event, was prejudicial.

In our view, given the discretion a trial judge has over the conduct of a trial, *Wilhelm, supra,* 272 Md. at 413, 326 A.2d at 714-15, we see no abuse of that discretion here. We believe the testimony was relevant and was not so inflamatory as to deny the appellant a fair trial. Under the conditions that obviously existed at the crime scene, it is not unusual that Officer Tucker made a mistake in noting what had been told to him by Creel. It was important to the State to show mistake and *why* the mistake was made. It is a basic rule of evidence that by requiring counsel to lay a proper foundation when attempting to impeach the credibility of a witness by showing a prior inconsistent statement, the witness may be rehabilitated by "refresh[ing] his recollection in regard to such statements, and be[ing] afforded the opportunity of making such explanation as he may deem necessary and proper." *State v. Kidd,* 281 Md. 32, 46 n. 8, 375 A.2d 1105, 1114 (1977), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977). Once such explanation is given by the

witness, it is up to the jury, as the trier of fact, to determine the credibility of the witness. *Watson v. State,* 282 Md. 73, 78, 382 A.2d 574, 577 (1978), *cert. denied,* 437 U.S. 908, 98 S.Ct. 1300, 57 L.Ed.2d 1140 (1978). Accordingly, we see no error for either of the two grounds listed here.

6.

This issue concerns a claim of error when the trial judge sustained an objection made by the State to an attempt by the appellant's counsel, during closing argument, to refer to a Delaware case where a Catholic priest had been criminally charged and the issue was identification. The appellant argues that since the Delaware case was common knowledge and one of mistaken identity, he should have been allowed to draw upon it as an analogy. The appellant concedes that, ordinarily, "counsel should not be permitted by the court, over proper objection, to state and comment upon facts not in evidence or to state what he could have proven." *Wilhelm, supra,* 272 Md. at 413, 326 A.2d at 714. Nevertheless, the appellant argues that such principle is not violated when a commonly known, specific example of mistaken identity is used to provide a graphic illustration of the fact that positive identifications may be wrong.

From what we glean from the recorded colloquy, which followed the objection, between counsel and the trial judge at the bench, it is not at all certain that the referred to case actually would qualify as a commonly known one of mistaken identity. During the colloquy, defense counsel stated:

> "MR. McCARTHY: All I can say, is Your Honor, is the jury is — Brings to this case the common sense and common knowledge and case I was about to mention in argument is most common knowledge in this country that everybody in this courtroom knows what happened the night in Delaware."

To which the trial judge replied:

"THE COURT: I doubt anybody knows, Mr. McCarthy, and including me. I don't know what happened in the case and nor do you. You don't know why the jury acquitted."

Thereafter, counsel stated:

"MR. McCARTHY: The State withdraws the charges."

We agree with the trial judge that the reason for the outcome of the Delaware case is not clear and, therefore, that case ought not be used to illustrate mistaken identity. *Cf. Wilhelm, supra,* 272 Md. at 440, 326 A.2d at 729, "reference the prosecutor made to the number of murders committed in Baltimore in 1972 — based upon the widespread publicity given such data — was but a direction by him to the jury of a fact that was within their common knowledge."

Whatever merit the appellant's contention may have, we do not believe the trial court's ruling was prejudicial to the appellant. The record reveals that, immediately preceding the objected to comment, defense counsel had argued:

"I will like to tell you what the Supreme Court has to say about identification testimony in a case like this.

I am quoting now from a case from the Supreme Court, United States vs. Wade, except I think — No, it is United States vs. Wade.

'The confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, degrade from a fair trial. The vulgarities of eye witness identification are well known. The annals of criminal law are ripe with instances of mistaken identification.

Mr. Justice Frankfurter once said, "What is the worth of identification testimony, even when

uncontradicted, the identification of strangers is verbally untrustworthy. The hazards of such testimony are established by a formal number of instances in the record of English and American history." ' "

The point that counsel was striving to make regarding mistaken identity was made. Thus, given the broad discretion the trial judge has in this area, we see no abuse.

## 7.

Next, the appellant contends that the trial judge erred in not granting his motion for a mistrial made on two separate occasions when reference was made to the appellant's former trial. The appellant argues that reference to a previous trial is as prejudicial as reference to a prior conviction, although we note that he failed to cite any authority for this proposition. During the testimony of State's witness Creel, in response to a question asked by the prosecutor seeking a characterization of a coat worn by one of the two robbers, Creel stated:

"I remember the last trial, the last time I said, it was safari coat."

The appellant made a timely objection and moved for a mistrial. The trial judge commented that he did not see any prejudice to the appellant and denied the motion.

The appellant further asserts that during the prosecutor's closing argument, he made reference to a "prior proceeding." As discussed herein under issue 2c, we find this second contention to be without merit. It is clear to us that the prosecutor was attacking the appellant's trial testimony as being manufactured after having heard the State's evidence and was not referring to the previous proceeding. Accordingly, the trial judge did not abuse his discretion in denying the mistrial on this basis.

As to the first ground, it is clear that Creel inadvertently stated "trial" but immediately corrected himself to say "last

time." While this may well have conveyed the fact of a previous trial to the jury, we do not believe any error was necessarily prejudicial to the appellant's right to a fair trial; certainly not to warrant concluding that the trial judge abused his discretion in denying the motion for a mistrial. As we stated in *Wilhelm, supra,* 272 Md. at 431, 326 A.2d at 724:

> " '[T]he mere occurrence of improper remarks does not by itself constitute reversible error. There must be an additional element for this conclusion to be reached. If we cannot say that the assailed argument constituted "a material factor in the conviction"; must have resulted in "substantial prejudice to the accused" or that "the verdict would have been different had the improper closing argument not been made * * * ", then we must necessarily conclude that no prejudicial error resulted from the argument.' " (Quoting *People v. Mackins,* 17 Ill. App. 3d 24, 308 N.E.2d 92 (1974); numerous citations omitted).

### 8.

While the appellant has raised several issues involving the sentencing proceeding and a general attack on the constitutionality of Maryland's Capital Punishment Statute, we need not address these issues in light of the conclusion reached in our discussion of part 1 above.

Nevertheless, we deem it appropriate to comment on portions of the prosecutor's closing argument. In our opinion in *Poole I, supra,* we clearly expressed our views with respect to counsel's argument to the jury concerning appellate review of a death sentence. We said:

> "Such comments have no relevance to the jury's duty of determining the existence of the various aggravating and mitigating factors, and in deciding whether, upon balancing these factors, a death sen-

tence should be imposed; rather, they tend to encourage the jury to believe that it can shift part of its responsibility to another body. We view such arguments as improper." 290 Md. at 125, 428 A.2d at 440.

In the instant case, while the prosecutor refrained from making comments specifically concerning the automatic and mandatory appellate review where the death penalty is imposed, he did make several comments with reference to the possibility of parole, such as:

"And what did they prove? That Mr. Poole is an ideal inmate, who is likely to get out of jail faster than anybody else alive, that he does ever —."

An objection was sustained. And again:

"Is the revolving door jail, parole, jail, parole, jail, parole going to protect you and —."

The court again sustained an objection. Yet again the prosecutor said:

"Will a life sentence protect us from Mr. Poole? Can you be sure, can you be sure in your own minds that that silver Cadillac won't someday be gliding quietly in the night in someone's residential community again with Mr. Poole in it?"

Objection to this statement was overruled. Later the prosecutor argued:

"I think a life sentence in this case would only send Mr. Poole back to Baltimore laughing, laughing at this proceeding, knowing that he only has to bide his time. All he has to do is wait, be a good inmate, do everything he has to do."

An objection was sustained. While the trial judge denied a motion for a mistrial, the appellant refused an appropriate instruction to the jury, stating in pertinent part, "it is our belief that an instruction could not cure the prejudice cre-

ated by the Prosecutor's remark and an instruction would only enlarge this area in the jury's mind and we are not requesting a curative instruction at this point."

In our view, reference to the possibility of future parole was improper and, upon remand, should not again be made. We have previously addressed the issue of the propriety of the prosecutor commenting on the possibility of parole and clearly held that such comments are improper. *See Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962). In *Shoemaker,* Chief Judge Brune stated:

> "The statements with regard to parole in the context in which they were made here, we think, exceeded the limits of permissible comment by the prosecutor. This Court has never had occasion, as far as we are informed, to consider the question whether remarks relating to possible parole, or similar remarks, constituted reversible error. Of course, each case depends a good deal on its own facts, even where the remarks may fall into the same general classification. References by a prosecutor to the right of appeal, the possibility of executive clemency and parole of a defendant have, however, been considered by many other courts. Although there are decisions each way, we think that the better reasoning and the weight of authority are against the propriety of such arguments. One reason in support of what we think is the better rule is that arguments should be based upon the evidence, but the principal objection to arguments of this type goes even deeper and is exemplified, we think, in the present case.
>
> The chief vice of the reference in this case to the possibility of parole is that it suggested to the jury that it might in part shift its responsibility for a finding of the defendant's guilt to some other body." *Id.,* at 468-69, 180 A.2d at 685 (numerous citations omitted).

In the instant case, we believe this type of argument is likely to allow the jury to disregard its duty to determine aggravating and mitigating factors, and to then balance one against the other as required by Code (1957, 1982 Repl. Vol.), Article 27, § 413, before imposing the death penalty. Any consideration of the possibility of parole as such simply is irrelevant and obviously prejudicial; we cannot condone such argument.

> *Judgments as to felony murder of Horad and as to use of handgun in crime of violence reversed; judgments as to premeditated murder of MacLarty and as to robbery with a dangerous weapon affirmed, except as to imposition of death sentence; death sentence vacated and case remanded to Circuit Court for Charles County for a new sentencing proceeding under Art. 27, § 413; each party to pay own costs.*

*Murphy, C. J., concurring in part and dissenting in part:*

I agree with that part of the majority opinion which affirms Poole's conviction for the first degree premeditated murder of Dr. MacLarty. I also agree with that part of the majority opinion which holds that under *Campbell v. State,* 293 Md. 438, 444 A.2d 1034 (1982), Poole's conviction for the felony murder of his accomplice Horad must be reversed. I do not agree, however, that the erroneous felony murder conviction of Poole for the killing of Horad requires that the sentence of death imposed on Poole for murdering Dr. MacLarty must be vacated and the case remanded for a new capital sentencing hearing.

The Court acknowledges "that the jury was properly instructed that it was to determine whether the death sentence should be imposed [upon Poole] only in regard to the

first degree premeditated murder of MacLarty." The Court nevertheless speculates that even though it was Dr. MacLarty, and not Poole who shot and killed Horad, "the jury's knowledge of the liability of Poole for Horad's death may have been prejudicial to the appellant." The Court builds upon this speculation with the further statement that "we cannot be sure that consideration of the now vacated conviction did not influence the jury in weighing the mitigating circumstances against the aggravating circumstance and in reaching its determination to impose the death penalty." The majority concludes that under *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), it could not declare that the error was harmless beyond a reasonable doubt.

Under Maryland Code (1982 Repl. Vol.), Article 27, § 414 (e), the Court is required to review the death penalty and determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

(4) . . . ."

A total of ten aggravating circumstances is provided under § 413 (d), one of which (subparagraph 10) is that the defendant was a guilty first degree principal in a murder committed during the course of a robbery. This was the only aggravating circumstance which the jury found, or possibly could have found, to exist in this case. Subparagraph (9) of § 413 (d) lists as an aggravating factor that the "defendant committed more than one offense of murder in the first degree arising out of the same incident." Poole's invalid conviction for the felony murder of Horad was a conviction for

murder in the first degree. However the trial judge expressly instructed the jury that it "must find as a matter of law" that this aggravating factor, as well as eight other aggravating factors listed in § 413 (d), were not present in this case. The jury answered "no" as to the existence of these nine factors. Because the jury was further properly instructed that only any aggravating factor that it found beyond a reasonable doubt to exist, *i.e.* number 10, was to be weighed against any mitigating factors that it found by a preponderance, jury consideration of Poole's conviction for Horad's killing was excluded from the weighing process under the binding instructions. Accordingly, there is no error on the part of the trial court on which to predicate a reversal of Poole's sentence for MacLarty's murder. By reversing, the majority violates one of the cardinal principles of appellate review which was well stated by the late Judge Jerrold V. Powers, writing for the court in *Braun v. Ford Motor Co.*, 32 Md. App. 545, 548, 363 A.2d 562, 564 (1976), when he said:

> We know of no principle or practice under which a judgment of a trial court may be reversed or modified on appeal except for prejudicial error committed by the trial judge. It is a misuse of language to label as error any act or failure to act by a party, an attorney, a witness, a juror, or by anyone else other than the judge. In other words, error in a trial court may be committed only by a judge, and only when he rules, or, in rare instances, fails to rule, on a question raised before him in the course of a trial, or in pre-trial or post-trial proceedings. Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error.

Under § 413 (g), there are eight categories of mitigating circumstances, one of which (subparagraph 1) is that the defendant has not previously been convicted of a crime of violence, defined therein to include robbery. Poole and the State stipulated during the sentencing hearing that Poole had been convicted of two prior robbery offenses; hence, he

could in no event receive the benefit of the mitigating circumstance that he had not previously been convicted of committing a crime of violence. Contrary to the suggestion made in the majority opinion, neither the prosecution nor the court made any reference during the sentencing hearing to Poole's conviction for the murder of Horad.

The jury found three mitigating circumstances to exist:

"(1) The subject was a good prisoner while incarcerated and abided by the rules and regulations of the institutions in which he was housed;

(2) The subject tried to better himself and prepare for his future by furthering his education;

(3) The subject volunteered his time to work with delinquent children in an attempt to rehabilitate them."

Under § 413 (h) the jury in this case was required to weigh the one aggravating circumstance that Poole had committed the premeditated murder of MacLarty during the course of an armed robbery against the mitigating circumstances that Poole was a good prisoner and abided by the rules during his incarceration; that he tried to better himself and prepare for his future through education; and that he volunteered "his time" to work with delinquent children. Our function under § 414 (e) (3) is to determine whether the evidence supported the jury's determination that the mitigating circumstances did not outweigh the aggravating circumstance. For the jury to have concluded that a cold-blooded premeditated murder was an aggravating circumstance which was not outweighed by the piddling mitigating circumstances found to exist in this case is an entirely rational jury judgment.

The majority's concern that Poole's erroneous conviction may have influenced the jury "in weighing the mitigating circumstances against the aggravating circumstance" is wholly unwarranted. It assumes that the jury ignored the court's concededly proper instructions and, in disregard of the statutory formulation, either added extra weight to the one aggravating circumstance, or somehow considered the

erroneous conviction as a negative factor reducing the weight accorded to the mitigating circumstances. I am unwilling to engage in the drawing of such rank assumptions, even in a death penalty case, where it is so plain that the jury did not take the erroneous conviction into account in any way as a justification for imposing the death penalty upon Poole. I therefore conclude that a new capital sentencing hearing should not be granted.

Judges Smith and Rodowsky authorize me to state that they join in the views expressed herein.

*Davidson, J., concurring and dissenting:*

I agree with the majority that the convictions of the appellant, Timothy Clyde Poole (accused), for the felony murder of his co-felon, Steven Scott Horad, and the use of a handgun in a crime of violence must be reversed. I therefore join in the views expressed in that portion of part 1 of the opinion that reach that conclusion. I further agree with the majority that the death penalty imposed for the accused's conviction for the premeditated murder of David C. MacLarty must be vacated both because of the jury's improper consideration of the accused's conviction for the felony murder of Horad and because of the prosecutor's improper comments on the possibility of parole. I therefore join in the views expressed in part 8 and that portion of part 1 that reach that conclusion. However, I cannot join in part 2 b of the opinion because I do not agree that the accused's convictions for the murder of MacLarty and for robbery with a dangerous weapon should be affirmed. In my view, both convictions should also be reversed because of an improper comment made by the prosecutor that improperly impeached the credibility of the defense's only alibi witness, and thereby prejudiced the accused and deprived him of a fair and impartial trial. Accordingly, to this extent, I respectfully dissent. Under these circumstances, I do not reach the other issues addressed in the opinion.

The record here shows that during closing argument defense counsel objected to, among other things, a comment

made by the prosecutor indicating that Yvonne Bethea Mitchell, the defense's only alibi witness, had not volunteered to take a lie detector test. More particularly, the record shows as follows:

"MR. ANDERS [prosecutor]: . . .

"Enough about the State's case. I would just like to review with you briefly the Defense's case as presented to you and I think you will agree with me that *the sum total of the Defense is Mr. Poole and his girlfriend, Yvonne Bethea* at that time, Mitchell today.

"*And the Defense is, of course, alibi. An alibi defense.*

. . .

"All right, her testimony was that Mr. Poole was there all night long and, of course, everything else, no one else came by, no one else was there, no one else can put him in the house, just his girlfriend.

. . .

"And my point in asking her where she was last year, a month or so before, was to test her memory and perhaps you to ask yourselves how difficult that is sometimes, to sit and all of a sudden to have to go back and pick out a day, a month or so before, to remember exactly what you were doing.

"That task becomes doubly hard when you are looking to pick out a day that is going to provide an alibi for a very, very close friend of yours charged with a very, very serious crime.

"*Now, I don't know if Yvonne Bethea is intentionally perjuring herself to protect Mr. Poole here in this case* or whether she honestly believes that he was there on that day. I don't know. I don't know

whether she knows at this point, but the point is, and the only point I was trying to make is sometimes it is very difficult when you are asked long after an event to recall back.

. . .

"Another important thing that you always have to look for, I know none of you, perhaps none of you have ever sat on a jury before, you have never had an alibi defense before but one thing you have to always look for, because it is very important key to an alibi defense, is what did the person do when they found out that they were the only witness that could establish beyond any doubt that Mr. Poole was not the person that committed these horrible crimes.

"If you had been with someone, a very close friend, a relative, a spouse, a child, on a specific night and he was arrested and charged with two murders, in which the death penalty is asked, I think that you would beat it to the police station so fast to tell them he was with me, you have got the wrong guy, go look for someone else, he was here, *I will take a lie detector test,* I will do anything, but she never, never, in the years that have passed since this crime, has ever gone to the police, ever told them anything, ever done anything other than to, all of a sudden show up in the court at a prior proceeding to provide this alibi.

"That is something you have got to consider, again a very important piece of the puzzle.

. . .

"MR. McCARTHY [defense attorney]: *We would enter the strongest objection* of two comments from Mr. Anders, Your Honor. *Move for a mistrial* on both.

204

"First, he has referred to Yvonne Bethea Mitchell's refusal to contact the police and take a lie detector test. We believe that is totally inappropriate and grounds for mistrial.

. . .

"MR. ANDERS: . . .

"As to the other motion for mistrial, as to, I mentioned a polygraph, I was referring to what another individual might do if they had been a witness to a crime, not that this witness should have done that.

"MR. McCARTHY: I don't think Mr. Anders' intent is the question, I think it is the fact of his words on the jury.

"THE COURT: *I will deny the motion for mistrial. I don't think the remarks were intended, nor did they give the impression that Mrs. Bethea, now known as Mrs. Mitchell, was offered and refused a lie detector test.*

. . .

"*I don't think that that has been any prejudice to the Defendant in this case and will deny the motion.*" (Emphasis added.)

The majority concludes that despite the prosecutor's reference to a lie detector test, "the appellant was not denied a fair trial." In reaching this conclusion, the majority relies upon three factors. The majority agrees with the trial court that the prosecutor's comment that the alibi witness had not volunteered to take a lie detector test " 'did [not] give the impression that . . . Mitchell [had been] offered [but] refused [to take] a lie detector test.' " In addition, the majority asserts that "[t]he reference to Mitchell's failure to take a lie detector test was not stated as an isolated item standing starkly by itself; rather, it appeared along with several other

actions the witness could have taken." Finally, the majority notes "that the appellant sought the most drastic remedy available rather than, for example, an admonition to the jury to disregard the statement." Indeed, according to the majority, "the appellant sought too much." Thus, on the basis of its independent review of the record, the majority holds that there was "no reversible error here."

I agree with the majority that the prosecutor's reference to a lie detector test did not support an inference that the alibi witness had been offered, but refused to take, a test. I also agree that a test was only referred to as one of several actions the witness could have taken. I further agree that the accused did not request a curative instruction to the jury. Nevertheless, in my view, the prosecutor's reference to a lie detector test was sufficiently prejudicial to deny the accused a fair trial. Consequently, the trial court's failure to grant a mistrial requires reversal.

In Maryland, as in virtually every other jurisdiction that has considered the question, the results of a lie detector test are inadmissible.[1] The fact of taking a test, the willingness to take a test, or the unwillingness or refusal to take an offered test are also generally inadmissible.[2] This principle

---

1. Kelley v. State, 288 Md. 298, 302-03, 418 A.2d 217, 219-20 (1980); *see, e.g.,* Frye v. United States, 293 F. 1013, 1013-14 (D.C.Cir. 1923); People v. Leone, 25 N.Y.2d 511, 517-18, 255 N.E.2d 696, 699-700, 307 N.Y.S.2d 430, 434-35 (1969); Commonwealth v. Brooks, 454 Pa. 75, 78, 309 A.2d 732, 733-34 (1973). *But see, e.g.,* State v. Dorsey, 88 N.M. 184, 184-85, 539 P.2d 204, 204-05 (1975); *cf.* Commonwealth v. Vitello, 376 Mass. 426, 453-56, 381 N.E.2d 582, 597-99 (1978).

Courts in many jurisdictions have held that test results are inadmissible even upon stipulation of the parties. *See, e.g.,* People v. Baynes, 88 Ill.2d 225, 239-40, 430 N.E.2d 1070, 1079 (1981); State v. Frazier, 252 S.E.2d 39, 46-49 (W.Va. 1979); *see also, e.g.,* Akonom v. State, 40 Md.App. 676, 686-87, 394 A.2d 1213, 1219-20 (1978). *But see, e.g.,* Commonwealth v. A Juvenile (No. 1), 365 Mass. 421, 429-33, 313 N.E.2d 120, 125-28 (1974); State v. McDavitt, 62 N.J. 36, 46-47, 297 A.2d 849, 854-55 (1972).

2. *See* Lusby v. State, 217 Md. 191, 194-95, 141 A.2d 893, 895 (1958).

For cases holding that a reference to the fact of taking a test is inadmissible, *see, e.g.,* Kaminski v. State, 63 So.2d 339, 339-41 (Fla. 1953); State v. Davis, 351 So.2d 771, 772-74 (La. 1977); State v. Edwards, 412 A.2d 983, 984-87 (Me. 1980); Mattox v. State, 240 Miss. 544, 557-61, 128 So.2d 368, 370-73 (1961).

For cases holding that a reference to willingness to take a test is inadmissible, *see, e.g.,* State v. Mower, 314 A.2d 840, 841 (Me. 1974); Common-

applies whether the person taking a test, willing to take a test, or unwilling or refusing to take an offered test is a witness [3] or the accused.[4] This principle also applies whether the evidence referring to a test is presented by a witness [5] or the accused.[6] Similarly, a comment made by an attorney in opening or closing arguments referring to a test may not properly come before the jury.[7]

Whether the accused has been prejudiced by a reference to a test that has been erroneously admitted or otherwise comes before the jury, ordinarily depends upon the facts and circumstances of the case.[8] In Maryland, as in most other jurisdictions it has generally been recognized that when a reference to the results of a test is erroneously admitted or otherwise reaches the jury, the accused is prejudiced.[9] More particularly, in *Kelley v. State*, 288 Md. 298, 418 A.2d 217 (1980), a person who had administered a test to an accused

wealth v. Saunders, 386 Pa. 149, 156-57, 125 A.2d 442, 445-46 (1956); State v. Rowe, 77 Wash.2d 955, 958, 468 P.2d 1000, 1003 (1970).

For cases holding that a reference to the refusal to take a test is inadmissible, *see, e.g.,* People v. Carter, 48 Cal.2d 737, 751-52, 312 P.2d 665, 674 (1957); State v. Hilton, 431 A.2d 1296, 1300-01 (Me. 1981); State v. Kolander, 236 Minn. 209, 221-22, 52 N.W.2d 458, 464-66 (1952); State v. Driver, 38 N.J. 255, 260-61, 183 A.2d 655, 658 (1962); State v. Britt, 235 S.C. 395, 425-26, 111 S.E.2d 669, 684-85 (1959).

Some few courts have held that reference to a test is admissible when the taking or refusal to take a test is a circumstance preceding a confession, *see, e.g.,* Tanner v. State, 259 Ark. 243, 248-50, 532 S.W.2d 168, 174 (1976); State v. Bishop, 223 Kan. 539, 541, 574 P.2d 1386, 1389 (1978). *But cf.* State v. Green, 271 Or. 153, 169-71, 531 P.2d 245, 252-53 (1975).

**3.** *See, e.g.,* Commonwealth v. Ball, 254 Pa.Super. 148, 150, 385 A.2d 568, 569-70 (1978); Nichols v. State, 378 S.W.2d 335, 336-38 (Tex.Crim.App. 1964).

**4.** *See, e.g.,* State v. Stafford, 213 Kan. 152, 161-62, 515 P.2d 769, 777-78 (1973); State v. Perry, 274 Minn. 1, 12-13, 142 N.W.2d 573, 580 (1966).

**5.** *See, e.g.,* Carter, 48 Cal.2d at 751-52, 312 P.2d at 674 (prosecution witness); Ball, 254 Pa.Super. at 150, 385 A.2d at 569-70 (defense witness).

**6.** *See, e.g.,* Rowe, 77 Wash.2d at 958, 468 P.2d at 1003.

**7.** *See, e.g.,* State v. Green, 154 Iowa 1379, 1383-86, 121 N.W.2d 89, 91-92 (1963); Stafford, 213 Kan. at 161-62, 515 P.2d at 777-78; Driver, 38 N.J. at 260, 183 A.2d at 658.

**8.** *See* Lusby, 217 Md. at 194-95, 141 A.2d at 895; *see also, e.g.,* Davis, 351 So.2d at 774; Edwards, 412 A.2d at 985.

**9.** Kelley, 288 Md. at 302-03, 418 A.2d at 219-20; *see* Lusby, 217 Md. at 194-95, 141 A.2d at 895; *see also, e.g.,* State v. Lowry, 163 Kan. 622, 630, 185 P.2d 147, 152 (1947).

Courts in some jurisdictions have held that a reference to test results is so prejudicial as to require reversal even when an objection has not been made, or the parties have stipulated to the admissibility of the test results. *See, e.g.,* Baynes, 88 Ill.2d at 239-40, 430 N.E.2d at 1079.

testified that the accused had initially refused to take an offered test, and later agreed to do so after realizing that his refusal might mean dismissal from the police force; that statements made by the accused during a post-test interview were inconsistent with and directly opposite those made during a pre-test interview; and that in his opinion the accused was lying. This Court determined that the evidence supported an inference that the accused had failed the test. It held that evidence inferring the results of a lie detector test was "inherently prejudicial," and that the admission of such evidence was reversible error. *Kelley*, 288 Md. at 303, 418 A.2d at 220.

The rationale underlying courts' conclusions that inadmissible evidence of test results is prejudicial is that the tests are not sufficiently reliable to establish what they purport to show — whether the person taking the test is lying. Such test results, therefore, improperly bolster or impeach credibility. As this Court said in *Kelley:*

> "[U]ntil such time as the reliability of this particular type of scientific testing has been appropriately established to the satisfaction of this Court, testimony which directly or indirectly conveys the results of such tests should not be admitted."
> *Kelley*, 288 Md. at 302, 418 A.2d at 219.

In addition to references to test results generally being held inadmissible and prejudicial, in Maryland as in most other jurisdictions, it has generally been recognized that when the fact of taking a test, the willingness to take a test, or the unwillingness or refusal to take an offered test is erroneously admitted or otherwise reaches the jury, the accused is prejudiced.[10] More particularly, in *State v. Driver*, 38 N.J. 255, 183 A.2d 655 (1962), a prosecutor, in an opening statement, stated that the accused was asked to take a test, and that he had repeatedly refused. There, the Supreme Court of New Jersey said:

---

10. *See* Lusby, 217 Md. at 195, 141 A.2d at 895; *see also, e.g.,* Carter, 48 Cal.2d at 751-52, 312 P.2d at 674, 678; Kaminski, 63 So.2d at 341; Green, 154 Iowa at 1383-86, 121 N.W.2d at 91-92; Stafford, 213 Kan. at 162-63, 515

"[T]o tell a jury of laymen at the very outset of the trial that defendant refused a number of times to take a lie detector test was to create a probable aura of prejudice which would permeate the proceeding to the very end." *Driver,* 38 N.J. at 260-61, 183 A.2d at 658.

The rationale underlying courts' conclusions that a reference to the fact of taking a test, the willingness to take a test, or the unwillingness or refusal to take an offered test is prejudicial, is that such a reference supports an inference of what the test results were or would have been. Such an inference improperly bolsters or impeaches credibility because the test is unreliable. This rationale has been expressed in different ways by different courts.

In *State v. Kolander,* 236 Minn. 209, 52 N.W.2d 458 (1952), a germinal case, the prosecutor, over objection, was permitted to adduce evidence from a deputy sheriff that the accused had refused to take an offered lie detector test. There, the Supreme Court of Minnesota, after determining that lie detector tests were not sufficiently reliable to permit test results to be admitted, said:

"There was no explanation to the jury of the operation or effect of a lie detector. As a matter of fact, it was not even shown what type of test defendant had refused to submit to. *The impact upon the minds of the jurors of a refusal to submit to*

P.2d at 778; Davis, 351 So.2d at 774; Edwards, 412 A.2d at 984-87; People v. Welke, 342 Mich. 164, 169, 68 N.W.2d 759, 761 (1955); Kolander, 236 Minn. at 222, 52 N.W.2d at 465-66; Mattox, 240 Miss. at 561, 128 So.2d at 373; Driver, 38 N.J. at 260-61, 183 A.2d at 659; Ball, 254 Pa.Super. at 150, 385 A.2d at 569-70; Britt, 235 S.C. at 426, 111 S.E.2d at 685. *But see, e.g.,* Meyer v. Commonwealth, 472 S.W.2d 479, 486 (Ky. 1971), *cert. denied,* 406 U.S. 919, 92 S.Ct. 1771 (1972); State v. Refuge, 270 So.2d 842, 847 (La. 1972); Cook v. State, 388 S.W.2d 707, 709 (Tex.Crim.App. 1965).

Courts in some few jurisdictions have held that a reference to a test is so prejudicial as to require reversal even when an objection has not been made, *see, e.g.,* Driver, 38 N.J. at 260-62, 183 A.2d at 658-59, or a curative instruction has been given, *see, e.g.,* Nichols, 378 S.W.2d at 337-38.

*something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test,* if given after a proper foundation had been laid showing how the apparatus functioned. Where a conviction rests so completely on circumstantial evidence, the erroneous admission of such action on the part of defendant might well be enough to tip the scales against him. We believe that it was *prejudicial error to permit such refusal of defendant to submit to the test to be shown." Kolander,* 236 Minn. at 222, 52 N.W.2d at 465-66 (emphasis added).

Thus, that Court held that a reference to an accused's refusal to take an offered lie detector test was prejudicial and required reversal.

In *State v. Driver,* 38 N.J. 255, 183 A.2d 655 (1962), a prosecutor in opening statement said that the accused had been asked to take a lie detector test, and that he had repeatedly refused. No objection was made. The Supreme Court of New Jersey, acknowledging that lie detector tests were not sufficiently reliable to permit test results to be admitted, said:

"If the results of polygraph examinations are not competent evidence, *a fortiori,* refusal by a defendant in a criminal case to submit to one cannot be made the subject of testimony. In terms of degree of prejudice, *the average jury, unfamiliar with the present scientific uncertainty of the tests, might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him* coupled with proof of its scientific imperfection. A refusal might be regarded as indicating a consciousness of guilt — undoubtedly the reason here why the Assistant Prosecutor placed such emphasis upon it in his opening. Moreover, his remarks were calculated to prejudice the jury by implying that the mechanical device was the ultimate in tests for the truth.

. . .

"Under the circumstances, we regard *the remarks in the opening concerning the lie detector test as possessing such horrendous capacity for prejudice* against the defendant as to constitute plain error." *Driver,* 38 N.J. at 261, 262, 183 A.2d at 658, 659 (emphasis added).

Thus, that Court held that a reference to an accused's refusal to take an offered lie detector test was prejudicial and required reversal.

In *Kaminski v. State,* 63 So.2d 339 (Fla. 1953), *cert. denied,* 348 U.S. 832, 75 S.Ct. 55 (1954), the prosecutor, over objection, was permitted to adduce evidence from the victim that he had taken a lie detector test. The Supreme Court of Florida, after acknowledging that lie detector tests were not sufficiently reliable to permit test results to be admitted, said:

"*When the trial judge allowed the evidence to be admitted,* and sanctioned the submission by the statement he made, we are of the view that *he committed as egregious an error as if he had admitted the results of the test* to have been received in evidence over objection. For there can be no doubt that in initiating the inquiry the prosecutor intended to leave in the minds of the jurors the impression that *because the witness Newbold had voluntarily submitted to a lie detector test prior to the time of trial he was a man of veracity and hence was telling the truth from the witness stand,* no matter how inconsistent his tale might appear to be to the jurors when compared with the testimony offered by other State witnesses.

"Can it logically be argued that the putting of the questions and the allowance of the answers under the circumstances prevailing at the trial did not have *a direct and profound tendency to influence or prejudice the minds of the jurors* against the defen-

dants? Can anything be clearer than that when defense counsel failed to cross-examine the witness as to the results of the test, after the court had announced that that course would be open to him in respect to 'what the test was on,' *an impression must have been implanted in the minds of the jurors that the result of the lie detector test had been unfavorable to the cause of defendants or else the inquiry would have been made?*

"It was not fair to place the defendants in the entrapped position that required them at their peril either to pursue the inquiry as to the nature of the results of the test or to be damned by the adverse impressions which naturally would be expected to flow from their failure to do so. *The practical effect of the admission of the testimony,* as fortified by the remarks of the trial judge when he overruled the objection, *was to allow, by inference, the admission of damaging evidence that would not have been legally admissible had it been submitted directly.* In a situation where the State's whole case depended entirely upon the testimony of a witness whose credibility appears to have been seriously shaken not only by cross-examination but by evidence given by other State's witnesses as well, the defendants should not have been placed in this intolerable position.

"Whatever the guilt or innocence of the defendants may ultimately prove to be, there can be no escape from the fact that at the trial they were entitled to the presumption of innocence with which the law clothes all persons accused of crime until proven guilty beyond a reasonable doubt by legally competent evidence. The successful attempt by the prosecution by the means employed to implant in the minds of the jury the impression that because the witness had voluntarily submitted to a lie detector test prior to trial he must perforce be tes-

tifying truthfully in the course of the trial, resulted, in effect, in the substitution of a mechanical device, without fair opportunity for cross-examination, for the time-tested, time-tried, and time-honored discretion of the judgment of a jury as to matters of credibility." *Kaminski,* 63 So.2d at 340-41 (additional emphasis added).

Thus, that Court held that a reference to a witness's willingness to take a test was prejudicial and required reversal.

I recognize that the reference objected to here did not involve the unwillingness or refusal of the alibi witness to take an offered test. Rather, the prosecutor in closing argument, over objection, stated that the only alibi witness did not volunteer to take a lie detector test. Nevertheless, in my view, the rationale underlying the general principle that a reference to test results, the fact of taking a test, the willingness to take a test, or the unwillingness or refusal to take an offered test, is inadmissible and prejudicial, dictates the result here.

Unlike the majority, I do not discern any meaningful difference between a reference to an unwillingness or refusal to take an offered lie detector test, and a failure to volunteer to take a test. Here, the alibi witness's failure to volunteer to take a test supports an inference that her reason for not volunteering was that she would have failed a test. Thus, her failure to volunteer to take a test, like the unwillingness or refusal to take an offered test, supported an inference of what the test results would have been. Because the test is unreliable, such an inference improperly impeached the alibi witness's credibility. Accordingly, in my view, the prosecutor's reference improperly came before the jury and the accused was prejudiced.

Moreover, I do not agree with the majority that, because the reference to the lie detector test was not isolated, but rather was stated as one of several actions the witness could have taken, the reference was not prejudicial. Notwithstanding its context, the reference to the alibi wit-

ness's failure to volunteer to take a test nonetheless supported an inference that the alibi witness was lying. Thus, the reference improperly impeached her credibility and prejudiced the accused.

Finally, unlike the majority, I find that under the circumstances of this case, the failure of the accused to request a curative instruction, rather than a mistrial, is immaterial. I recognize that in *Lusby*, 217 Md. at 195, 141 A.2d at 895, this Court acknowledged that the prejudice resulting from an improper reference to a prosecuting witness's willingness to take a lie detector test could be obviated by a curative instruction from the trial court.[11] There, the prosecuting witness, in response to a question from the prosecutor as to whether she had been given any tests, replied, "Yes sir, a lie detector." *Lusby*, 217 Md. at 194, 141 A.2d at 895. An objection was sustained, and the trial court immediately instructed the jury to disregard the answer. This Court found that under those circumstances "the prompt action of Judge Gray, in instructing the jury to disregard the answer of the prosecutrix, fully satisfied the right of the defendant to a fair trial." *Lusby*, 217 Md. at 195, 141 A.2d at 895.

---

11. I note that subsequent to *Lusby*, some courts in other jurisdictions have held that a curative instruction is not sufficient to obviate the prejudice resulting from improper references concerning lie detector tests. *See, e.g.*, Green, 254 Iowa at 1383-86, 121 N.W.2d at 91-92; Nichols, 378 S.W.2d at 337-38. *But see, e.g.*, Pinkney v. State, 241 So.2d 380, 382 (Fla. 1970); Stallings v. Commonwealth, 556 S.W.2d 4, 5 (Ky. 1977). Moreover, at least one court has recognized, in a case strikingly similar to the instant case, that although ordinarily a curative instruction is enough to obviate such prejudice, it is insufficient in a death penalty case. State v. Britt, 235 S.C. 395, 426, 111 S.E.2d 669, 684-85 (1959).

In *Britt*, a witness, in response to a question, stated that one of three accused persons took a lie detector test but that the remaining two "were given the opportunity but refused." Britt, 235 S.C. at 421, 111 S.E.2d at 683. An objection was overruled. Thereafter, the trial court, on its own motion, instructed the jury that it had erred in admitting the testimony, that it was to be stricken from the record, and that the jury was to disregard it. No motion for a mistrial was made.

There, the Supreme Court of South Carolina held that, notwithstanding the absence of a motion for a mistrial after a curative instruction had been given, it would consider the question whether the admission of an accused's refusal to take a lie detector test constituted reversible error and held that it did. In reaching its conclusion, the Court pointed out that it had previously held that an error on the part of a trial court in admitting incompetent testimony was cured when the testimony was stricken, an objection was sustained, or the jury was instructed to disregard the testimony. The Court

However, here, the circumstances are substantially different from those in *Lusby.* The record here shows that the accused objected to the prosecutor's reference to the failure of the alibi witness to volunteer to take a test. In addition, he moved for a mistrial. The trial court overruled the objection and denied the motion for a mistrial because it found that there had not been "any prejudice to the Defendant. . . ." By finding that the prosecutor's reference to a lie detector test was not prejudicial to the accused, the trial court effectively foreclosed the possibility that it would afford any remedy designed to obviate prejudice. Under the circumstances

---

further pointed out that it had previously held that where the objectionable nature of testimony was brought to the attention of the trial court and stricken, and the trial court had instructed the jury to disregard the testimony, the error was cured in the absence of a motion by the accused for a mistrial. Nevertheless, the Court then considered whether it would apply these procedural rules in a case involving the death penalty.

In reaching its conclusion that the procedural rules ordinarily applicable in criminal cases would not be rigidly applied in a death penalty case, that Court said:

"The power of the law to take the life of human beings for a violation of the law is one which should be and is exercised with extreme caution. The frailties of human nature are so manifold and manifest until the law should and does place around the defendant, whose life will be taken for a violation of the law, every safeguard to enable such defendant to secure a fair and impartial trial. This Court has taken the position that in all cases involving the life of the defendant, it is not bound down to a consideration of the exceptions raised, but if anything appears in the record which would warrant a reversal of the cause, this Court will consider that matter as if raised by the exceptions. *What effect incompetent testimony may have on the minds of the jurors, even after instructions to disregard same, is impossible to say.*

. . .

"We are convinced that the testimony directing the attention of the jurors to the fact that the appellant Britt had been guilty of previous crimes, and *the testimony of his refusal to take a lie detector test, even though this testimony was finally stricken out and the jury instructed to disregard the same, constitutes prejudicial error* and entitles him to a new trial." Britt, 235 S.C. at 424, 426, 111 S.E.2d at 684, 685 (emphasis added).

Thus, the Court acknowledged that, in light of the extraordinary character of a death penalty case, a curative instruction was insufficient to obviate the prejudice resulting from an improper reference to a lie detector test.

Under the facts of the death penalty case here, however, I need not depart from the principle expressed in *Lusby.*

here, any attempt to request a curative instruction, rather than a mistrial, would have been futile. The law does not require the performance of a futile act.[12]

On the basis of my independent review of the record, I can only conclude that because any request by the accused for a curative instruction would have been denied, the remedy of a curative instruction relied upon in *Lusby,* and suggested here by the majority, was unavailable. It is for this reason, in my view, that the fact that the accused sought a mistrial, "the most drastic remedy available rather than, for example, an admonition to the jury to disregard the statement," is immaterial. Indeed, under the circumstances here, I feel constrained to affirmatively disassociate myself from the majority's view that a person's life may depend upon the performance of a futile act.

When all is said and done, the unvarnished fact that emerges from this record is that the prosecutor referred to the alibi witness's failure to volunteer to take a test. That reference supported an inference that her reason for not volunteering was that she would have failed the test, and therefore supported an inference of what the test results would have been. Such an inference improperly impeached the alibi witness's credibility.

The central core of the accused's defense was an alibi. The success of that alibi defense was dependent upon the credibility of the alibi witness. Under the circumstances here, I cannot declare a belief beyond a reasonable doubt that the improper impeachment of the alibi witness's credibility did not influence the jury's verdicts. Accordingly,

---

**12.** Rolfe v. Clark, 269 Md. 14, 18, 304 A.2d 231, 233 (1973); Hylton v. Mayor of Baltimore, 268 Md. 266, 279, 300 A.2d 656, 662 (1972); Parish v. Maryland & Virginia Milk Producers Ass'n, 250 Md. 24, 82, 242 A.2d 512, 544 (1968), *cert. denied,* 404 U.S. 940, 92 S.Ct. 280 (1971); Shoreham Developers, Inc. v. Randolph Hills, Inc., 248 Md. 267, 277-78, 235 A.2d 735, 742 (1967).

I would reverse the accused's convictions for the murder of MacLarty, and for robbery with a dangerous weapon, and would remand for a new trial.

Judge Cole authorizes me to state that he joins in the views expressed herein.